**UNITED STATES of America**

**v.**

**Aleksandras LILEIKIS.**

**Civ. A. No. 94–11902–RGS.**

United States District Court,
D. Massachusetts.

Sept. 15, 1995.

---

David S. Mackey, Boston, MA, for plaintiff.

John Rogers Carroll, Philadelphia, PA, Thomas J. Butters, Boston, MA, for defendant.

### MEMORANDUM OF DECISION AND ORDER ON GOVERNMENT'S MOTION TO COMPEL

STEARNS, District Judge.

Aleksandras Lileikis is accused of acts of genocide in his native Lithuania. Lacking jurisdiction to prosecute Lileikis, the government seeks to revoke his citizenship and expel him from the United States.

On September 21, 1994, the United States commenced a civil action to rescind Lileikis's citizenship pursuant to section 340(a) of the Immigration and Naturalization Act of 1952, 8 U.S.C. § 1451(a). The Complaint alleges that Lileikis, the Chief of the Lithuanian Security Police (the Saugumas) during the Nazi occupation, "was personally responsible for the arrest, detention and execution of Jews, those who aided Jews, suspected communists, and other civilians." In his answer, Lileikis invoked the Fifth Amendment privilege against self-incrimination and refused to admit or deny the government's substantive allegations. The United States challenges Lileikis's assertion of the Fifth Amendment privilege on three grounds: (1) that Lileikis has failed to provide the requisite foundation for the invocation of the privilege; (2) that the privilege is not applicable when a claimant fears prosecution on the part of a foreign government; and (3) waiver. The government seeks an Order compelling Lileikis to admit or deny those allegations of the Complaint to which he has asserted the privilege, or risk a finding of contempt.

## DISCUSSION

The Fifth Amendment privilege "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). The privilege "not only extends to answers that would in themselves support a conviction under a . . . criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). The centrality of the privilege to the values that animate our notions of justice was forcefully expounded by Justice Goldberg in *Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964):

> The privilege against self-incrimination "registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" *Ullmann v. United States*, 350 U.S. 422, 426 [76 S.Ct. 497, 500, 100 L.Ed. 511 (1956)]. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load.' 8 Wigmore, Evidence (McNaughton rev., 1961), 317;

our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life.' *United States v. Grunewald*, 233 F.2d 556, 581–582 [(1956)] (Frank J., dissenting), rev'd 353 U.S. 391 [77 S.Ct. 963, 1 L.Ed.2d 931 (1957)]; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn v. United States*, 349 U.S. 155, 162 [75 S.Ct. 668, 673, 99 L.Ed. 964 (1955)] [internal footnote omitted].

A witness may invoke the privilege if he or she reasonably believes that a truthful answer could lead to a criminal prosecution. *Kastigar v. United States*, 406 U.S. 441, 444–445, 92 S.Ct. 1653, 1656–1657, 32 L.Ed.2d 212 (1972). The fear of prosecution, however, must not be speculative. It must be supported by reason or cause. *Marchetti v. United States*, 390 U.S. 39, 53–54, 88 S.Ct. 697, 705–706, 19 L.Ed.2d 889 (1968). In a civil proceeding, the assertion of the privilege is not without penalty. The finder of fact is permitted to draw an adverse inference when a party to a civil action declines to answer a question on grounds of potential self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976).

The crux of the government's argument is that the Fifth Amendment privilege is not available to one who fears prosecution by a foreign government.[1] For present purposes, the government is willing to concede that Lileikis's apprehension of prosecution by the Lithuanian authorities is well-founded.[2] See Government's Memorandum, at 10 n. 2. The intention of Lithuania to prosecute Lileikis for war crimes has been announced at

---

1. Lileikis attempts to deflect this argument by cataloguing a series of domestic offenses that he theoretically could be prosecuted for, including voter fraud under Massachusetts General Laws, c. 56, §§ 6, 8. No reported case suggests that anyone has ever been so prosecuted by Massachusetts authorities. In assessing the validity of a claim of privilege, a court must determine the practical likelihood, not the legal possibility of a

prosecution. See *Carter v. United States*, 643 A.2d 348 (D.C.App.1994). The federal crimes Lileikis recites as possible subjects of prosecution have long since fallen to the statute of limitations.

2. The United States and Lithuania executed an extradition treaty on April 9, 1924. With modifications, the treaty remains in force today.

the highest levels of its government.[3] The United States, for its part, pursuant to a Memorandum of Understanding between the two countries, has provided information concerning Lileikis to the authorities in Lithuania and, consistent with its obligations under the Memorandum, acknowledges that it will continue to do so.

The United States Supreme Court has never decided whether the fear of foreign prosecution is a sufficient basis, in and of itself, for invocation of the Fifth Amendment privilege. In *Zicarelli v. New Jersey State Comm'n of Investigation,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), the Court considered the issue, but declined to decide it after determining that Zicarelli had failed to show a "real and substantial danger" that testimony sought under a grant of immunity would in fact incriminate him under foreign law. *Zicarelli* has been interpreted to mean that the validity of a Fifth Amendment claim should be considered only after a court determines that there is a well-founded fear of foreign prosecution.

While *Zicarelli* provides a framework for analysis, no consensus has emerged among the Courts of Appeals as to the extent of the Fifth Amendment's reach.[4] The two decisions directly on point appear to reach different conclusions. The government relies on a Fourth Circuit decision, *United States v. (Under Seal) (Araneta),* 794 F.2d 920 (4th Cir.1986), while Lileikis points to a recent Eleventh Circuit case, *United States v. Gecas,* 50 F.3d 1549 (11th Cir.1995). In *Araneta,* a daughter and son-in-law of former Philippine President Ferdinand Marcos refused to testify before a grand jury investigating possible corruption in the awarding of Philippine arms contracts.[5] The Aranetas argued that their answers would incriminate them in

a prosecution then pending in the Philippines involving the alleged theft of public property. In *Gecas,* a case factually similar to this one, the defendant, also an alleged Nazi collaborator, contended that the answers sought by the government in a deportation proceeding would incriminate him under the laws of Israel, Germany and Lithuania.

In *Araneta,* the Fourth Circuit found little difficulty in surmounting the bar erected by *Zicarelli* to substantive consideration of the Aranetas' Fifth Amendment claims. Applying a test developed by the Second Circuit in *In re Grand Jury Subpoena of Flanagan,* 691 F.2d 116, 121 (2d Cir.1982), the *Araneta* court determined that the Aranetas were not only facing pending charges in the Philippines involving similar subject matter, but that the United States government's resolve to assist the Philippines in recapturing stolen public assets made it almost certain that the Aranetas would be bundled over at the request of the Philippine authorities.[6] The Aranetas, for their part, while conceding that the grant of use and derivative use immunity (18 U.S.C. §§ 6002, 6003) had effectively foreclosed any fear that they might have had of prosecution by the United States, argued that they could not be compelled to answer questions posed by American officials that might incriminate them under the laws of the Philippines. Although the Fourth Circuit characterized the argument as advocating an extraterritorial effect for the Fifth Amendment, 794 F.2d at 923, more precisely the Aranetas' contention was that the extraterritorial consequences of compelled self-incrimination should act as a burden on the *territorial* power of the United States to overcome an assertion of the privilege. The Aranetas were refusing to give testimony before a grand jury investigating violations of United

---

**3.** See, e.g., Boston Globe, March 2, 1995, at p. 6, quoting both the President of Lithuania and the Deputy Prosecutor General to the effect that evidence already in Lithuania's possession is sufficient to convict Lileikis of genocide.

**4.** District courts that have reached the issue are also divided, with the majority of decisions favoring the exercise of the privilege where the fear of foreign prosecution, in the court's judgment, is well-grounded. See, e.g., *United States v. Trucis,* 89 F.R.D. 671, 673 (E.D.Pa.1981).

**5.** It is not clear from the opinion, but the grand jury investigation presumably involved dealings between Philippine citizens and American arms suppliers.

**6.** The Court of Appeals also held that the protective order issued by the district court pursuant to Fed.R.Crim.P. 6(e) did not adequately foreclose the possibility of future disclosure of the Aranetas' testimony to Philippine authorities.

States, not Philippine law. They were not arguing that the Philippines had any obligation to respect the Fifth Amendment privilege in its own proceedings. Cf. *Ocampo v. United States*, 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914). Indeed it is the absence of any such obligation that prompted the Aranetas to claim the privilege in the first place.

In response, the *Araneta* court made essentially three points: (1) that the Fifth Amendment, by its own terms, "does not purport to have effect in foreign countries, and ordinarily, unless specifically stated otherwise, a provision of domestic law, statutory or constitutional, is deemed to apply only to the jurisdiction which enacts it," 794 F.2d at 925; (2) that the privilege applies only when the compelling sovereign and the using sovereign "are both restrained by the Fifth Amendment," *id.* at 926; and (3) that while "[c]omity among nations dictates that the United States not intrude into the law enforcement activities of other countries conducted abroad," dictates of national sovereignty demand that the United States not forego "evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country." *Id.*

The first point rests on the indisputable fact that the United States Constitution has never been purported to be of global application. Indeed, a claim of universal hegemony by the Constitution's framers or guardians would have been "so significant an innovation in the practice of governments that if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view." *United States v. Verdugo–Urquidez*, 494 U.S. 259, 269, 110 S.Ct. 1056, 1062, 108 L.Ed.2d 222 (1990) (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 770, 70 S.Ct. 936, 939, 94 L.Ed. 1255 (1950)). In *Verdugo–Urquidez*, the issue was the right of a nonresident alien to assert the protections of the Fourth Amendment against a search conducted by United States

officials on foreign soil. Writing for the majority, Chief Justice Rehnquist emphasized that the Fourth Amendment (like the First and Second) uses the construct "the people," a term of art understood by the Framers to refer "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.*, 494 U.S. at 265, 110 S.Ct. at 1060. The Chief Justice agreed that "[t]he language of these Amendments contrasts with the words 'person' and 'accused' used in the Fifth and Sixth Amendments." *Id.* at 265–266, 110 S.Ct. at 1060–1061. But he also pointed out that the *Eisentrager* Court, while recognizing the Fifth Amendment's incorporation of the "relatively universal term of 'person,'" nonetheless rejected the Fifth Amendment claims of alien prisoners of war in Allied custody seeking writs of habeas corpus in United States courts. *Id.* at 269, 110 S.Ct. at 1062. Under the reasoning of *Verdugo–Urquidez*, nonresident aliens like the Aranetas, whose connections to the United States were transient at best,[7] would have only the most tenuous of claims to the Fifth Amendment privilege, however well grounded their fear of an extraterritorial prosecution. *Id.* at 271, 110 S.Ct. at 1064. ("[A]liens receive constitutional protection when they have come within the territory of the United States and developed substantial connections with this country"). Lileikis, however, is a United States citizen, and pending the outcome of this case, stands on far firmer ground than the Aranetas in this respect.

The second point made by the *Araneta* court is simply a recapitulation of the first, and is based on the historical relationship of federal and state sovereigns. As the Fourth Circuit pointed out, prior to *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964), the Fifth Amendment did not apply to the individual states but only to the federal government, and that, as a matter of practice, testimony compelled by one sovereign was routinely used in prosecu-

7. The Aranetas were admitted into the United States by the Attorney General under advanced parole status, 8 U.S.C. § 1182(d)(5), that is, they were "present, but not admitted, [and subject to return] to the Philippines in the discretion of the Attorney General when he determines that their presence no longer serves the public interest." 794 F.2d at 922–923.

tions by the other. From this, the government concludes, as did the *Araneta* court, that "the privilege applies only under circumstances where the sovereign threatening prosecution is bound by the Fifth Amendment." Government's Memorandum, at 12. Neither of these points, however, is very helpful in answering the question of whether Lileikis has a valid Fifth Amendment claim. To say that Lithuania is not bound to respect the Fifth Amendment privilege, is not to say that the Constitution could not be interpreted to bind the United States to respect the constraints of the privilege when persons like Lileikis claim its protections.

The final argument in *Araneta* is more persuasive, that the national sovereignty of the United States "would be compromised if our system of criminal justice were made to depend on the actions of a foreign government beyond our control." 794 F.2d at 926. There is, however, an important caveat. The *Araneta* court perceived no hint that the United States was, explicitly or implicitly, acting as an agent of the Philippines in seeking evidence from the Aranetas.

> [P]etitioners have not suggested that the United States, in compelling their testimony under a grant of immunity, pursues no legitimate purpose of its own, even if it also has an intention to assist a foreign government whose continued good will is of great strategic importance. In short, petitioners have not presented to us a claim of American participation in a foreign prosecution, either actually, through a joint venture with foreign law enforcement officials, or constructively, by means of employing such individuals as agents. The case before us does not require us to address either of these factual patterns, as we express no views on them at this time.[8]

794 F.2d at 928.

This passage from *Araneta* is instructive. On the one hand, the United States cannot be deterred by the threat of a prosecution by a foreign sovereign from gathering evidence for its own purposes. Why this is so can be seen by imagining a circumstance in which a foreign state threatened a prosecution, not to advance an interest that the United States considered salutary, like securing the punishment of a war criminal, but to impede the execution of United States law.[9] On the other hand, the United States should not place itself in the unseemly position of acting as a surrogate for a foreign state by extracting evidence from its own citizens to be used in a way forbidden to the United States itself. Stated this way, the issue is whether the legitimate need of the United States for Lileikis's testimony outweighs any ancillary desire of the United States to facilitate Lileikis's prosecution by Lithuania.

Before attempting to answer that question, I turn to the principal authority urged by Lileikis, *United States v. Gecas*, 50 F.3d 1549 (11th Cir.1995). Vytautas Gecas was accused of collaborating with Nazi occupation forces while serving as an auxiliary police officer in Taurage Province, Lithuania. In 1991, the Office of Special Investigations (OSI) of the United States Department of Justice sought to compel Gecas to answer questions about his wartime activities. The Eleventh Circuit reversed a holding by the district court that the Fifth Amendment is not a personal right protecting a witness who fears incrimination or prosecution under the laws of a foreign state. In deciding whether Gecas had a real and substantial fear of foreign prosecution (the *Zicarelli* threshold), the Eleventh Circuit applied a three part test it had developed in *In re Application of President's Comm'n on Crime (Scaduto)*, 763 F.2d 1191, 1198 (11th Cir.1985): (1) "whether there is a likelihood that [the claimant's] testimony would be disclosed to a foreign government;" (2) "whether any of the [potential] charges would entitle the foreign jurisdiction to have him extradited;" and (3) "whether there is an existing or potential foreign prosecution of the claimant." Observing first that OSI's sole mission is the collection of information

---

8. As the *Araneta* court pointed out, this caveat is consistent with existing jurisprudence on the extraterritorial dimensions of the Fourth Amendment. *Id.* See *United States v. Hensel*, 699 F.2d 18, 25 (1st Cir.1983).

9. Examples might include a renegade state seeking to protect the bosses of a drug cartel or the leaders of a terrorist organization by threatening the prosecution of lieutenants granted immunity as a means of compelling their testimony.

for purposes of instituting legal proceedings against suspected Nazi war criminals (and not the enforcement of the immigration laws), the Eleventh Circuit found that the likelihood that Gecas's testimony would be disclosed to a prosecution-minded foreign government was virtually certain. 50 F.3d at 1558. In this regard, the court made note of the Memorandum of Understanding between the United States and Lithuania and of OSI's history of cooperation with foreign governments willing to undertake war crimes prosecutions.[10]

Turning to the second prong of the test, the Eleventh Circuit determined that "it is not only possible but also probable that Gecas will be deported to Lithuania." 50 F.3d at 1561.[11] And finally, the court concluded that while no foreign prosecution was actually pending, the probability that Gecas would in fact be prosecuted for war crimes by either Lithuania or Israel was virtually assured. 50 F.3d at 1561–1562. Satisfied that Gecas's fear of foreign prosecution was "real and substantial," the court addressed Gecas's claim of privilege as follows:

> We reject the district court's contention that the privilege only protects an individual's freedom from governmental over-reaching in domestic law enforcement. The Fifth Amendment privilege against self incrimination is a personal right; it is a matter of individual dignity.... Just as the privilege is extended to prevent over-zealous prosecution and to constrain the government, the privilege creates in the individual the freedom to remain silent where the testimony may be adverse to his penal interests. One purpose need not eclipse the other in its function. If the court reasonably finds that the fear of foreign prosecution is an actuality rather than a mere speculation, the individual should prevail and be permitted to invoke the privilege. If the prospect of foreign prosecution is pure conjecture, then the importance of domestic law enforcement prevails, and the witness must testify. We

believe such a balance both reasonably serves the purpose of the privilege and preserves the goals of domestic law enforcement.

50 F.3d at 1564–1565.

At first blush, the rhetorical sweep of this holding appears to place the Eleventh Circuit at polar opposites from the Fourth. On closer examination, however, the *Gecas* and *Araneta* cases are not as irreconcilable as they appear. The Eleventh Circuit distinguished *Araneta* on the grounds that the *Araneta* court had found that "the United States was not assisting any foreign government in prosecuting the [Aranetas]." 50 F.3d at 1558. By contrast, the *Gecas* court determined that OSI's principal motivation was to impress the district court into the service of a foreign prosecution. The Eleventh Circuit discounted any need on OSI's part for Gecas's compelled cooperation, concluding that OSI "may well have sufficient evidence without Gecas's testimony to commence deportation proceedings against him." 50 F.3d at 1564. "Moreover, we are troubled that OSI is using an Article III court to compel testimony which it readily may transfer to a foreign country, particularly Lithuania, for prosecution of Gecas," information being sought primarily because it had been "promised by OSI to a foreign nation for its use." Id. at 1565. This purpose the Eleventh Circuit deemed an abuse of the judicial system. "[T]he compulsion brought to bear here is the contempt power of an Article III court—the historical protector of individual liberties and bulwark against the type of governmental oppression that caused our forefathers to flee some of the same foreign lands to which the OSI now would have us deliver an American resident for prosecution on the basis of his own testimony." Id. at 1566.

It is possible, despite the rhetorical differences, to borrow constructively from both the *Araneta* and *Gecas* opinions. When a real and substantial fear of incrimination or prosecution under foreign law has been established, as it has been here, a court en-

**10.** Like the *Araneta* court, the Eleventh Circuit discounted the value of a protective order as a shield against the eventual disclosure of Gecas's testimony. 50 F.3d at 1559.

**11.** The court noted that if Gecas were found to have entered the United States illegally, the Attorney General had no discretion to prevent his deportation. 50 F.3d at 1560.

809

treated to exercise its contempt power is obligated to examine the government's purpose and need in seeking to compel a witness's testimony. If a governmental interest in enforcing the organic laws of the United States is involved, and the United States has a legitimate need for a witness's testimony in furthering that interest, the privilege must yield if the sole basis for claiming its protections is the fact that a resident of the United States faces the likelihood of a foreign prosecution. It would be an unacceptable affront to the sovereignty of the United States if the operation of its laws could be stymied by the desire of a foreign government to prosecute the same witness. That the United States may have a contingent purpose to aid a foreign nation in vindicating its own laws, or as in this case, international law, is not determinative. On the other hand, I agree that a court of the United States should not bend the Constitution solely to promote the foreign policy objectives of the executive branch, however laudable, by compelling the cooperation of a witness in a proceeding that does not have as its fundamental purpose the vindication of the domestic laws of the United States.[12]

Because I believe that the resolution of this issue may be dispositive of Lileikis's case, it is not necessary that I address at this time the government's argument that Lileikis has waived any privilege that he might have by falsely answering questions on his immigration application.[13]

### ORDER

The parties are within thirty days of this date to advise the court whether a hearing should be held to determine whether a legitimate need has been shown by the United States for the compelled cooperation of the defendant in the case now pending before the court. Each side shall have fourteen days thereafter to file a reply.

SO ORDERED.

---

12. The United States became a party to the Convention on the Prevention and Punishment of the Crime of Genocide on November 4, 1988, when President Reagan signed The Genocide Convention Implementation Act. The penalties of the Act (18 U.S.C. § 1091(b)) are prospective. The Convention was ratified by the Senate with the stated understanding that it was not to have the effect of an extradition treaty.

13. The government's argument that Lileikis has failed to properly invoke the privilege by refusing "to identify which, if any, specific factual allegations ... give rise to his fear of criminal prosecution," or those "particular criminal statutes, of any particular sovereign, to which he might still be subject," Government's Memorandum, at 9, also need not be addressed, given the government's concession, for present purposes, that Lileikis has a real and substantial fear of prosecution by Lithuania.