**UNITED STATES of America, Petitioner,**

v.

**Aloyzas BALSYS, Respondent.**

No. 93 Misc. 227 (SJ).

United States District Court,
E.D. New York.

March 5, 1996.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, New York, for petitioner.

Neal Sher, Director, Office of Special Investigations, Criminal Division by Robert G. Seasonwein, Senior Trial Attorney, Washington, DC, Ivars Berzins, Babylon, New York, for respondent.

## MEMORANDUM AND ORDER

JOHNSON, District Judge:

Pursuant to Section 235(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1225(a), as amended, the United States seeks to enforce an administrative subpoena issued by the Director of the Office of Special Investigations (the "OSI").[1] The subpoena was issued in conjunction with the OSI's civil investigation into Aloyzas Balsys's ("Respondent" or "Balsys") immigration and entry into the United States.

## BACKGROUND

Aloyzas Balsys is a resident alien presently living in Woodhaven, New York. He was born on February 6, 1913 in Ansieniai, Plateliai Province, Lithuania and entered the United States on June 30, 1961 pursuant to Section 221 of the Immigration and Naturalization Act. In connection with his application to enter the United States, Balsys swore that the information contained in his application for Immigrant Visa and Alien Registra-

---

1. The OSI, an arm of the Criminal Division of the Department of Justice, was created by Attorney General Benjamin R. Civiletti in 1979 to investigate and institute denaturalization and deportation proceedings against suspected Nazi war criminals. *See* Order of the Attorney General, No. 851–79, September 4, 1979.

tion was true.[2] The OSI contends that Balsys lied in his immigration application about his activities during World War II.[3] Specifically, the OSI claims to have information and evidence that Balsys assisted the Nazi forces then occupying Lithuania, and that he participated in the persecution of persons because of their race, religion, and/or political opinion. If this information had been available to the government when Balsys applied for entry into the United States, his application would most likely have been denied. Now that Respondent is in the United States, this information, if true, would likely subject him to deportation.

In furtherance of its investigation into Balsys' wartime activities, the OSI issued an administrative subpoena commanding him to give testimony and to produce documents relating to his immigration to the United States, and to his activities in Europe between 1940 and 1945. In response, Balsys appeared at a deposition, and, after providing his name and address, asserted a Fifth Amendment privilege as to all other questions. He also refused to produce the documents described in the subpoena, with the exception of his alien registration card.

Balsys contends that he is entitled to the protection afforded by the Fifth Amendment based on his fear that answering the government's questions could subject him to prosecution by the governments of Lithuania, Germany and Israel. The United States challenges Balsys's assertion of the Fifth Amendment privilege on three grounds: (1) that Balsys has not demonstrated a real and substantial fear of foreign prosecution; (2) that, even if Balsys had shown a real fear of prosecution abroad, the Fifth Amendment privilege is not applicable when a claimant fears prosecution on the part of a foreign government; and (3) waiver.

2. Balsys's visa application stated, in relevant part:
> I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may subject me to permanent exclusion from the United States and, if I am admitted to the United States, may subject me to criminal prosecution and/or deportation.

For the reasons set forth below, this Court concludes that Balsys does in fact face a real and substantial danger of foreign prosecution. The Court also finds that, under the facts of the present case, the Fifth Amendment privilege does not provide protection against fear of incrimination under foreign law. Even if the Fifth Amendment were applicable to Balsys, this Court finds that his representations to the immigration authorities in 1961 constituted a waiver of those rights.

## DISCUSSION

### I. The Fifth Amendment Privilege

██ The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." This privilege against self-incrimination "not only extends to answers that would in themselves support a conviction under a ... criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a ... crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

██ The privilege protects both witnesses and defendants in any proceeding, whether civil or criminal. *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). The witness may invoke the privilege, however, only if he "has reasonable cause to apprehend danger from a direct answer." *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818. A reasonable fear is one based on a prospect of penal liability that is "real and substantial" and not merely speculative. *Zicarelli v. New Jersey Investigation Commission,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972). *See also Marchetti v. United States,* 390 U.S. 39, 53,

Respondent's Application for Immigrant Visa and Alien Registration, Exhibit D to the Government's Petition.

3. On his application, Balsys stated that between 1934 and 1940, he served in the Lithuanian Army, and from 1940 to 1944, he lived in Plateliai, Lithuania, and was "in hiding from N.K.V.D. and ... Chairman of Municipality." *Id.* at p. 2.

88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968) ("The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination.").

■ The Fifth Amendment privilege against self-incrimination is available to resident aliens as well as to American citizens. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 & n. 5, 73 S.Ct. 472, 477–78 & n. 5, 97 L.Ed. 576 (1953).[4] Balsys has no reason to fear domestic prosecution in this case,[5] and indeed he has not alleged any such fear. Rather, he charges that forcing him to testify regarding his activities during World War II and his immigration to the United States could subject him to prosecution by the governments of Lithuania, Germany and Israel. Thus, the issue before the Court is whether Balsys can avoid complying with the OSI subpoena by asserting the Fifth Amendment privilege against self-incrimination based on a fear of foreign prosecution.

## II. *Fear of Foreign Prosecution*

To date, neither the Supreme Court nor the Second Circuit has decided the question of whether the Fifth Amendment privilege against self-incrimination can be asserted on the grounds of fear of foreign prosecution. In *Zicarelli v. New Jersey Investigation Commission*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), the Supreme Court granted *certiorari* to consider this question but then determined that it was unnecessary

because Zicarelli's fear of being prosecuted by a foreign court was remote and speculative. *Id.* at 478, 92 S.Ct. at 1675.[6] The court held that, assuming a fear of foreign prosecution is within the scope of the privilege, a witness can assert the privilege only after establishing that the information sought would tend to incriminate him under foreign law and pose a substantial risk of foreign prosecution. *Id.* at 480–81, 92 S.Ct. at 1676–77.

## A. Real and Substantial Fear

In *In re Grand Jury Subpoena of Flanagan*, 691 F.2d 116, 121 (2d Cir.1982), the Second Circuit identified a number of factors that bear on whether the witness's fear of foreign prosecution is real or imaginary. In making this determination, the Court should "focus on questions such as whether there is an existing or potential foreign prosecution of him; what foreign charges could be filed against him; whether prosecution of them would be initiated or furthered by his testimony; whether any such charges would entitle the foreign jurisdiction to have him extradited from the United States; and whether there is a likelihood that his testimony given here would be disclosed to the foreign government." *Id.*

■ Here, there is no existing foreign prosecution of Balsys. Balsys claims, however, that the testimony sought by the OSI would incriminate him under the laws of Lithuania, Germany and Israel, thereby subjecting him to potential prosecution.[7] In order to determine whether Balsys's answers

---

4. In *United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990), the Supreme Court limited its decision in *Kwong Hai Chew* to holding that a "resident alien is a 'person' within the meaning of the Fifth Amendment," but the Fourth Amendment prohibition against unlawful searches and seizures does not apply extraterritorially to aliens.

5. 18 U.S.C. § 3282 establishes a five year statute of limitations for concealment of material fact or the making of false or fraudulent statements under 18 U.S.C. § 1001. Since Balsys entered the United States on June 30, 1961, the statute of limitations has long since run for any criminal charge that could have arisen from his immigration.

6. Similarly, the Second Circuit has failed to reach the question of whether the Fifth Amend-

ment privilege against self-incrimination may be invoked on the ground of potential foreign prosecution. *See In re Grand Jury Witness Gilboe*, 699 F.2d 71, 78 (2d Cir.1983) (not necessary to decide Constitutional question because immunized grand jury witness's alleged fear of foreign prosecution was "at best speculative and remote"); *In re Grand Jury Subpoena of Flanagan*, 691 F.2d 116, 124 (2d Cir.1982) (not necessary to decide Constitutional question because immunized grand jury witness "failed to demonstrate any real or substantial risk of foreign prosecution").

7. For example, some of the questions posed to Balsys by OSI are as follows:
Q: Where were you when the Soviets occupied Lithuania in June of 1940, Mr. Balsys?
Q: Mr. Balsys, what did you do during the Soviet occupation of Lithuania?

would incriminate him, the Court must review the relevant criminal provisions from each sovereign.[8]

In 1992, Lithuania adopted a statute punishing Nazis and Nazi collaborators for crimes committed against the Lithuanian people during World War II.[9]

Q: Mr. Balsys, where were you in June of 1941 when the Germans occupied Lithuania?
Q: What did you do during the German occupation of Lithuania?
Q: When did you join the Villiaus Saugumas?
Q: Who is the commanding officer of the Villiaus Saugumas?
Transcript of Deposition of Aloyzas Balsys, November 16, 1993, at p. 8.
Q: While you served in the Saugumas, did you work in the Communist and Jews section?
Q: Were you responsible for the arrest and imprisonment of Jews?
Q: While you served in the Villiaus Saugumas, did you work in the Polish section?
Q: Were you responsible for the arrest and imprisonment of Poles?
*Id.* at p. 9.
Q: During the time that you served in the Villiaus Saugumas, did you work in the investigations section?
Q: Did you turn prisoners over to the Special Detachment?
*Id.* at p. 10.
Q: At the time you applied to immigrate to the United States, why didn't you tell the U.S. Vice Consul in Liverpool that you had served in the Villiaus Saugumas?
Q: Were you afraid if you told the truth you would not be allowed to immigrate to the U.S.?
*Id.* at p. 11.
Balsys refused to answer any of these questions, asserting the Fifth Amendment privilege. He also refused to answer questions directed at eliciting general biographical information, such as whether he is employed, whether he collects social security, and his present state of health. *See id.* at p. 4–5.

8. The Court bases its discussion on foreign laws and treaties submitted by the Respondent. The government argues that Respondent has not provided any certified copies of the laws and treaties mentioned, and has failed to provide certified translations of the foreign language documents submitted. In addition, the government argues that Respondent offers no proof that the laws and treaties he cites are currently applicable. Notwithstanding its objections, however, the government does not assert that the translations submitted by Respondent are inaccurate or that the foreign laws cited are invalid. The Court also notes that counsel for Respondent submitted virtually the same set of foreign laws, treaties and translations in *United States v. Gecas,* 50 F.3d 1549 (11th Cir.1995), and the Eleventh Circuit relied on these submissions in its opinion.

The statute provides for punishments ranging from five years imprisonment to death. Law Concerning Responsibility for Genocide of the People of Lithuania, No. 1–2477, Article 1 (1992) (Lithuania), *as translated in* Appendix to Respondent's Memorandum at Tab 7. The law is retroactive, and

9. Lithuania's "Law Concerning Responsibility for Genocide of the People of Lithuania" provides in pertinent part:

The Supreme Council of the Republic of Lithuania, . . .
declaring that a policy of genocide and crimes against humanity was carried out against the populace of Lithuania during the period of occupation by Nazi Germany and the period of occupation and annexation by the USSR,
in accordance with the generally recognized rule of the international community, that the destruction of people for any reason is perceived to be a crime, passes this law.
Article 1
Actions which strive, completely or in part, to physically destroy people who belong to any particular national, ethnic, racial or religious group, and which manifest themselves through the murder of members of these groups, brutal torture, physical maiming, mental retardation; the deliberate creation of such living conditions through which it is strived to completely or in part destroy persons from these groups; the forcible transfer of children from these groups to others or the use of means which seek to forcibly limit the birth rate (genocide)—
are punishable by incarceration for five to fifteen years along with the confiscation of belongings and property or by the death penalty along with the confiscation of belongings and property.
Article 2
The murder or torture of people in Lithuania, the deportation of her people, executed during the period of occupation by Nazi Germany or the period of occupation and annexation by the USSR, conform to the definition of crimes of genocide as indicated in the norms of international law.
Article 3
The law "Concerning Responsibility for Genocide of the People of Lithuania" is retroactive. A statute of limitations is not applicable in those criminal cases where individuals committed the actions described in this law up until the date it comes into force.
Law Concerning Responsibility for Genocide of the People of Lithuania, Num. 1–2477 (1992) (Lithuania), *as translated in* Appendix to Respondent's Memorandum at Tab 7.

there is no statute of limitations for prosecution of these crimes. *Id.*

In 1992, Lithuania also formed a commission to investigate crimes of genocide committed against the Lithuanian people during World War II when the country was under occupation by Germany and the Soviet Union. Resolution In re The Application of the Law "Concerning Responsibility for Genocide of the People of Lithuania," No. 1–2478 (1992) (Lithuania), *as translated in* Appendix to Respondent's Memorandum at Tab 7. In creating this commission, the Supreme Council of Lithuania resolved to enter into agreements with the United States, Israel and other states "for judicial assistance in cases involving the investigation of crimes of genocide." *Id.* In light of the above, the Court finds that the responses sought from Balsys by OSI could show that he engaged in conduct punishable under Lithuania's genocide law.

Germany's murder statute, [StGB] Article 211, reads as follows:

Article 211 Murder

(1) A murderer shall be punished by imprisonment for life.

(2) A murderer is a person who kills another person from thirst for blood, satisfaction of his sexual desires, avarice or other base motives in a malicious or brutal manner or one dangerous to public safety or in order to permit the commission or concealment of another criminal act.

Article 211, *reprinted in* Adalbert Ruckerl, The Investigation of Nazi Crimes 1945–1978, at 41–42 (Derek Rutter, trans., 1979). Germany has prosecuted persons suspected of crimes against Jewish people under this statute, which apparently has no statute of limitations, for murders that occurred during World War II. It is not clear, however, whether this statute is applicable to non-German citizens alleged to have committed the punishable acts outside the territorial jurisdiction of Germany.[10] If the statute does not cover crimes committed outside of Germany by non-German citizens, then the testimony sought by the OSI would not be incriminating to Balsys under German law.

Israel's "Nazis and Nazi Collaborators (Punishment) Law," 3710–1930 (1950) (Israel), applies extraterritorially and imposes the death penalty for persons who, "during the period of the Nazi regime, in an enemy country," committed crimes against Jewish people.[11] Thus, the responses sought from Bal-

10. In support of his contention that he has a reasonable fear of prosecution in Germany, Balsys has submitted a 1982 correspondence between former United States Attorney General William F. Smith and the former German Minister of Justice Jurgen Schmude. Appendix to Respondent's Memorandum at Tab 10. In that letter, Attorney General Smith recognized that "there [are] discrete legal questions in cases [regarding the extradition] of non-German citizens who acted beyond German borders." *Id.*

In addition, Balsys points to the case of Albert Helmut Rauca as an example of the German murder statute's applicability to non-German citizens accused of aiding and abetting the Nazis in territories occupied by Germany during World War II. Balsys asserts that Rauca, a non-German citizen residing in Canada, was extradited to Germany. Once there, he was tried for crimes that allegedly took place in Lithuania. Respondent's Memorandum at 11. Balsys also cites the case of Hermine Ryan, who was accused of being an S.S. Supervisory Warden at the Lublin Concentration Camp in Poland and was extradited from the United States to Germany in 1973. *See In re Ryan*, 360 F.Supp. 270 (E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir.1973). The Court notes, however, that the record does not reflect any direct evidence of these prosecutions.

11. The Nazis and Nazi Collaborators (Punishment) Law, 3710–1930, states in pertinent part:

1. (a) A person who has committed one of the following offences—
(1) done, during the period of the Nazi regime, in an enemy country, an act constituting a crime against the Jewish people;
(2) done, during the period of the Nazi regime, in an enemy country, an act constituting a crime against humanity;
(3) done, during the period of the Second World War, in an enemy country, an act constituting a war crime, is liable to the death penalty.
(b) In this section—
"crime against the Jewish people" means any of the following acts, committed with intent to destroy the Jewish people in whole or in part:
(1) killing Jews;
(2) causing serious bodily or mental harm to Jews;
(3) placing Jews in living conditions calculated to bring about their physical destruction; . . .
(7) inciting to hatred of Jews; "crime against humanity" means any of the following acts:
murder, extermination, enslavement, starva-

sys by the OSI could incriminate him under Israeli law.

Although Germany's potential to prosecute Balsys remains unclear, the Court finds that if Balsys answered the OSI as anticipated his testimony would inevitably tend to incriminate him under both Lithuanian and Israeli law. Therefore, the Court concludes that there is the potential that Balsys could be prosecuted abroad despite the fact that no such prosecution has yet been initiated. Specifically, Balsys could be charged under Lithuania's Law Concerning Responsibility for Genocide of the People of Lithuania and under Israel's Nazis and Nazi Collaborators (Punishment) Law.

Under *Flanagan,* the Court must also consider the likelihood that Balsys's testimony would be disclosed to the governments of Lithuania and Israel. The OSI was created for the sole purpose of investigating and gathering evidence of alleged Nazi collaborators residing in the United States illegally, and taking legal action to denaturalize, deport or prosecute them. The Attorney General's order establishing the OSI states that the OSI shall:

1. Review pending and new allegations that individuals, who prior to and during World War II, under the supervision or in association with the Nazi government of Germany, its allies, and other affiliated governments, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin or political opinion;

2. Investigate, as appropriate, each allegation to determine whether there is sufficient evidence to file a complaint to revoke citizenship, support a show cause order to deport, or seek an indictment or any other judicial process against any such individuals;

3. Maintain liaison with foreign prosecution, investigation and intelligence offices;

4. Use appropriate Government agency resources and personnel for investigations, guidance, information, and analysis; and

5. Direct and coordinate the investigation, prosecution, and any other legal actions instituted in these cases with the Immigration and Naturalization Service, the Federal Bureau of Investigation, the United States Attorneys Offices, and other relevant Federal agencies.

Order of Atty.Gen. 851–79 (Sept. 4, 1979).

In addition, the OSI has entered into an agreement to provide evidence that it has gathered on suspected Nazi collaborators to Lithuania. *See* Memorandum of Understanding Between the United States Department of Justice and the Office of the Procurator General of the Republic of Lithuania Concerning Cooperation in the Pursuit of War Criminals, August 3, 1992, U.S.–Lithuania [hereinafter "Memorandum of Understanding"]. This agreement states, in part, that:

... [T]he United States Department of Justice agree[s] to provide ... legal assistance concerning the prosecution of persons suspected of having committed war crimes in World War II in Lithuania and who are now residents of the United States—to facilitate the interview of witnesses, the conduct of other necessary activities, the collection of documentary materials and other information relevant to these investigations.

Memorandum of Understanding. The government claims that, to date, no country has expressed an interest in Balsys. This argument is inapposite. Whether or not Lithuania has to date expressed an interest in Balsys, the Court finds that his testimony here would in fact be disclosed based on the

tion or deportation and other inhumane acts committed against any civilian population, and persecution on national, racial, religious or political grounds;
"war crime" means any of the following acts: murder, ill-treatment or deportation to forced labour or for any other purpose, of civilian population of or in occupied territo-

ry; murder or ill-treatment of prisoners of war or persons on the seas; killing of hostages; plunder of public or private property; wanton destruction of cities, towns or villages; and devastation not justified by military necessity.
Appendix to Respondent's Memorandum at Tab 14.

terms of the Memorandum of Understanding.

■ Similarly, the Court finds that there is a substantial likelihood that Balsys's testimony would be disclosed to Israel. Although the Court is not aware of any specific agreement between the United States and Israel regarding the exchange of such information, the OSI has shared with Israel incriminating evidence that it gathered on suspected Nazi collaborator Ivan Demjanjuk. *See United States v. Gecas,* 50 F.3d 1549, 1558 (11th Cir.1995). Given the OSI's duty to "maintain liaison with foreign prosecution, investigation and intelligence offices" and the fact that it has shared similarly incriminating evidence with Israel in the past, it appears that the OSI would in all probability disclose Balsys's testimony to Israel.[12]

Finally, under the *Flanagan* test the Court must consider the possibility that Balsys could be extradited from the United States to a foreign jurisdicion capable of prosecuting him. If Balsys is found to have lied about his activities during World War II on his visa application, he could be deported. If, in turn, Balsys is found to be deportable, the Attorney General of the United States has no discretion to prevent his deportation. *See* 8 U.S.C. §§ 1251(a)(4)(D), 1253(h) (designating participants in the Nazi persecution of persons during World War II "deportable aliens" and removing Attorney General's discretion from withholding deportation); *Linnas v. I.N.S.,* 790 F.2d 1024, 1029 & n. 1 (2d Cir.) ("The deportation of Nazi persecutors is required even though the deportee's life or freedom might be threatened as a result."), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). The deportation of Balsys would thus amount to *de facto* extradition. *See Gecas,* 50 F.3d at 1560 (upholding district court's finding that deportation of the defendant, a suspected Nazi collaborator, was *de facto* extradition because defendant "would be forced to enter a country disposed to prosecute him").

■ The government contends that even if it secures an order deporting Balsys, he may

12. The Court rejects the government's contention that a sealing order would eliminate Balsys's real and substantial fear of foreign prosecution. *Cf. United States v. (Under Seal) (Araneta),* 794 F.2d 920, 924–25 (4th Cir.) (rejecting ability of protective order issued by the district court pursuant to Fed.R.Crim.P. 6(e) to protect witnesses from disclosure of grand jury testimony to foreign government because of foreign relations and importance of case), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986); *In re Cardassi,* 351 F.Supp. 1080, 1082 (D.Conn.1972) (rejecting Fed.R.Crim.P. 6(e)'s ability to protect witness from disclosure of grand jury testimony to foreign government). Although the government has not requested that the Court place a sealing order on the deposition and transcripts, it would not oppose the issuance of such an order. The government asserts that a sealing order would ensure that the information gained from Balsys's testimony would not be disclosed to Israel or Lithuania.

In support of its argument, the government relies on the Seventh Circuit's decision in *In re Contempt Petition (Mikutaitis),* 800 F.2d 159 (7th Cir.1986). In that case, the OSI sought to depose Mikutaitis, who was of Lithuanian descent, as part of discovery in a denaturalization proceeding being conducted against another alleged Nazi collaborator in the Middle District of Florida. Despite a grant of immunity pursuant to 18 U.S.C. sec. 6002, Mikutaitis asserted the Fifth Amendment privilege based on his fear of prosecution by the Soviet Union for war crimes. The district judge assigned to the denaturalization case had attempted to shield Mikutaitis through a grant of immunity and an order that the deposition be put under seal.

The Seventh Circuit affirmed the district court's decision finding Mikutaitis in contempt for refusing to be deposed. *Id.* The court held that Mikutaitis was sufficiently protected by the safeguards ordered by the Florida court. In so ruling, the court reasoned that Mikutaitis had presented no evidence in support of his claim that the district court could not effectively limit access to the deposition or that "one of the parties, namely the OSI, is under some form of pressure to ignore the court's order and share the information ..." *Id.* at 163.

The Court finds that the present case is distinguishable. The Seventh Circuit's decision in *In re Contempt Petition (Mikutaitis)* was based on the underlying premise that the OSI was under no pressure to disregard the sealing order. Here, Balsys has established that the OSI is indeed likely to disclose his testimony pursuant to the terms of the Memorandum of Understanding with Lithuania. *See also Gecas,* 50 F.3d at 1559 (rejecting the ability of a sealing order to protect witness where the OSI was under significant pressure to disclose the testimony based on the OSI's stated mission and the Memorandum of Understanding with Lithuania). Therefore, there is a substantial likelihood that any testimony provided by Balsys would be disclosed to Lithuania even if the deposition and transcript are sealed.

designate the country to which he wishes to be deported. As the Eleventh Circuit reasoned in *Gecas*, however, Balsys's right to designate the country to which he would be sent "is subject to the Attorney General's discretionary conclusion 'that deportation to such country would be prejudicial to the interests of the United States.' " *Id.* (citing 8 U.S.C. § 1253(a)). Even if the Attorney General were to approve Balsys's country designation, that country could refuse to accept him because he is a suspected Nazi collaborator. If rejected by his designated country, Balsys would be sent to the country of which he is a citizen. *See* 8 U.S.C. § 1253(a). Thus, there is no guarantee that Balsys would be deported to the country of his choice.

Accordingly, under the *Flanagan* factors, the Court is persuaded that Balsys faces a "real and substantial" danger of prosecution by Lithuania and Israel. The Court must now consider whether Balsys may assert his Fifth Amendment privilege to avoid testifying.

## B. Application of the Fifth Amendment

The Courts of Appeals which have considered the constitutional question of whether the Fifth Amendment privilege provides protection for a witness once it has been determined that he has a reasonable fear of foreign prosecution have reached different conclusions. The Fourth Circuit and the Tenth Circuit have held that a fear of foreign prosecution is not a sufficient basis for invoking the Fifth Amendment privilege. *See United States v. (Under Seal) (Araneta)*, 794 F.2d 920, 926–28 (4th Cir.) (the Fifth Amendment may not be invoked by a witness who fears foreign prosecution unless that foreign country also honors the privilege against self-incrimination), *cert. denied*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) [hereinafter *Araneta*]; *In re Parker*, 411 F.2d 1067, 1069–70 (10th Cir.1969) (holding that Fed.R.Crim.P. 6(e) would prevent disclosure of witness's testimony to foreign officials, thereby negating fear of foreign prosecution, and, alternatively, that "the fifth amendment provides no shelter ... against incrimination in a foreign jurisdiction" where federal domestic immunity has been granted), *vacated as moot sub nom. Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970).

In *Araneta*, the daughter and son-in-law of former Philippine President Ferdinand Marcos asserted the Fifth Amendment privilege and refused to testify before a grand jury investigating possible corruption in arms contracts with the Philippines. The Aranetas claimed that although they had been granted use and derivative use immunity (18 U.S.C. §§ 6002, 6003) and were thus protected from domestic prosecution, their answers to the grand jury would incriminate them in a pending prosecution in the Philippines. Applying the factors set forth by the Second Circuit in *Flanagan*, the court concluded that the Aranetas had established a real fear of prosecution in the Philippines.

Despite the Aranetas' reasonable fear of foreign persecution, the court held that they could not claim the Fifth Amendment privilege before the grand jury "[s]ince the Fifth Amendment would not prohibit the use of compelled incriminating testimony in a Philippine court." *Araneta*, 794 F.2d at 926. In so ruling, the court reasoned that just as "[c]omity among nations dictates that the United States not intrude into the law enforcement activities of other countries conducted abroad," the United States' own sovereignty would be compromised if it were required "to forego evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country." *Id.*

The Eleventh Circuit, on the other hand, has held that the Fifth Amendment may be asserted by an individual on the basis of a fear of foreign prosecution. *See United States v. Gecas*, 50 F.3d 1549 (11th Cir.1995). In *Gecas*, the defendant, also an alleged Nazi collaborator, claimed that the answers sought by the OSI in a deportation proceeding would incriminate him under the laws of Germany, Israel and Lithuania. Reversing the lower court's decision that the Fifth Amendment protection was not applicable to the defendant, the Eleventh Circuit "reject[ed] the district court's contention that

the privilege *only* protects an individual's freedom from government overreaching ..." *Id.* at 1564, finding instead that "the Fifth Amendment privilege supports two goals: constraining the government from overzealous prosecution of individuals and securing individual liberties." *Id.* at 1562. The court based its holding on the notion that the Fifth Amendment privilege is "a personal right; [and] ... a matter of individual dignity." *Id.* at 1564.

The district courts which have considered this issue have also varied in their conclusions. Several district courts have found that a fear of foreign prosecution is a valid basis for applying the Fifth Amendment. *See Mishima v. United States* 507 F.Supp 131, 134–35 (D.Alaska 1981) (privilege available to Japanese seaman being investigated in grounding of vessel); *United States v. Trucis* 89 F.R.D. 671, 673–74 (E.D.Pa.1981) (privilege may be applied only "to those questions posing a real threat of incrimination," but not to questions about entry into the U.S. or naturalization proceedings); *United States v. Kowalchuk,* Civil Nos. 77–118 and 77–119 (E.D.Pa. October 20, 1978) (privilege applicable in denaturalization proceedings against brothers alleged to have achieved citizenship by concealing their participation in persecution of Jews in Poland on their visa application).

In a recent case in the District of Massachusetts, however, Judge Stearns held that "the government's purpose and need in seeking to compel a witness's testimony" must be examined in order to determine whether the witness may invoke the Fifth Amendment privilege based on a fear of foreign prosecution. *United States v. Lileikis,* 899 F.Supp. 802, 809 (D.Mass.1995). In that case, the government commenced a civil action to rescind the defendant's citizenship. In his answer to the complaint, the defendant, who was accused of committing acts of genocide in his native Lithuania, invoked the Fifth Amendment privilege against self-incrimination and refused to admit or deny the government's substantive allegations. Borrowing from both the *Araneta* and the *Gecas* opinions, the court concluded that:

If a governmental interest in enforcing the organic laws of the United States is involved, and the United States has a legitimate need for a witness's testimony in furthering that interest, the privilege must yield if the sole basis for claiming its protections is the fact that a resident of the United States faces the likelihood of a foreign prosecution. It would be an unacceptable affront to the sovereignty of the United States if the operation of its laws could be stymied by the desire of a foreign government to prosecute the same witness.... On the other hand, I agree that a court of the United States should not bend the Constitution solely to promote the foreign policy objectives of the executive branch, however laudable, by compelling the cooperation of a witness in a proceeding that does not have as its fundamental purpose the vindication of the domestic laws of the United States.

*Lileikis,* 899 F.Supp. at 809.

Within the Second Circuit, Judge Newman, then sitting in the District of Connecticut, held in *In re Cardassi,* 351 F.Supp. 1080, 1081 (D.Conn.1972), that the Fifth Amendment privilege is applicable where a witness fears foreign prosecution. That case involved a grand jury witness who had been granted use immunity pursuant to 18 U.S.C. § 6003. The witness claimed the right to invoke the Fifth Amendment privilege based on her fear that, despite domestic use immunity, her testimony could be used against her in a foreign prosecution. The court reasoned that since the Supreme Court has construed the Fifth Amendment privilege to have the same scope under the United States Constitution as it has in England, where it applies to fear of foreign prosecution, the privilege can be claimed in proceedings in the United States by a witness who fears prosecution abroad. *Id.* at 1086.

With deference, this Court declines to follow the Eleventh Circuit's decision in *Gecas.* The Court is not unmindful of the Fifth Amendment's role in preserving an individual's privacy and dignity. *See Gecas,* 50 F.3d at 1564–65. This Court is of the opinion, however, that the *Gecas* holding allows foreign law to unreasonably infringe on domes-

tic activity. This Court is similarly not persuaded by *In re Cardassi*. Instead, the Court finds the reasoning set forth by Judge Stearns in *Lileikis* persuasive given the facts of this case.

█ Balsys is a resident alien who allegedly entered the United States under false pretenses. The OSI seeks testimony from Balsys in conjunction with its investigation as to whether, on his application for an entry visa, he lied about his activities during World War II. Thus, the specific issue before the Court is whether an individual who was granted entry into the United States based on the government's reliance on the truthfulness of the sworn statements on his visa application can now take refuge in the Fifth Amendment privilege and escape verifying the answers he gave on the document that served as his passport to America.

█ The Fifth Amendment is not applicable extraterritorially. *See Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). It serves to regulate the relationship between federal and state governments and their citizens. The Supreme Court has stated that the privilege against self-incrimination reflects

> our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load."

*Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964) (citation omitted). This Court agrees with the Fourth Circuit that these values would not be vitiated by a decision declining to extend the privilege against self-incrimination in the present case. *See Araneta*, 794 F.2d at 926 ("Our decision that the Aranetas cannot find shelter in the Fifth Amendment does not imperil [the] values [underlying the Fifth Amendment]."). Balsys does not face the possibility of domestic prosecution, thus there is no incentive for the government to elicit self-incriminating statements from Balsys by "inhumane treatment and abuses." *Murphy*, 378 U.S. at 55, 84 S.Ct. at 1597. Moreover, because the United States Constitution is not applicable in Israel or Lithuania, allowing Balsys to invoke the Fifth Amendment privilege will not serve to promote the principles underlying our criminal justice system.

█ Rather, to allow Balsys to invoke the privilege would unreasonably impinge on the government's ability to monitor and verify immigration and visa applications. As stated by the court in *Lileikis*, "the United States cannot be deterred by the threat of a prosecution by a foreign sovereign from gathering evidence for its own purposes." 899 F.Supp. at 807. The government has a strong interest in determining whether or not an individual misrepresented information on his visa application. In seeking to compel Balsys's testimony, the government's primary purpose is "the vindication of the domestic laws of the United States." *Id.* at 809. Although Balsys does indeed have a real and substantial fear of prosecution by Lithuania and Israel, the laws of the United States should not be sacrificed where the government has established an independent and legitimate need for his testimony.

█ In declining to extend the Fifth Amendment privilege in the present case, the Court concludes that the fundamental purpose of the privilege is to protect individuals against governmental overreaching. Balsys seeks to assert the privilege as a means to thwart the enforcement of domestic law. This is contrary to the values the Fifth Amendment was intended to protect. Although Balsys may suffer harm as a result of the incriminating nature of the disclosure, the government has a valid purpose. There is no indication that the government's motive is malicious, or that the government is engaging in "overzealous prosecution."

A contrary decision by this Court would allow individuals attempting to immigrate to the United States to misrepresent their per-

sonal histories and other relevant information in order to gain access to this country, leaving the government without recourse and seriously eroding domestic law enforcement. Accordingly, the Court concludes that Respondent is not entitled to invoke the Fifth Amendment privilege against compelled self-incrimination.

■ Although this holding is limited to the facts of the present case, the Court is of the opinion that the Fifth Amendment was intended to preserve a witness's individual privacy only in the context of a criminal prosecution by our state or federal government and for the sole purpose of preventing governmental overreaching. This Court therefore believes that the Fifth Amendment privilege cannot be asserted by a witness who fears prosecution under the criminal laws of a foreign sovereign.

### III. Waiver of Fifth Amendment Privilege

■ Even if Balsys were entitled to the protection of the Fifth Amendment, the Court finds that he waived any such privilege when he first applied for immigration and answered questions posed to him by government officials.

■ Voluntary statements on a given subject constitute an implied waiver of any subsequent Fifth Amendment claim related to that subject. Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951); United States v. St. Pierre, 132 F.2d 837, 840 (2d Cir.1942). Statements made in one proceeding, however, cannot constitute a waiver of the privilege at a separate proceeding. See United States v. Housand, 550 F.2d 818, 821 n. 3 (2d Cir.), cert. denied, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977).

The Court finds that the present case does not involve two separate proceedings. In 1961, Balsys initiated immigration proceedings which remain open today. When he first applied for an immigrant visa in 1961, officials at the United States Consulate in Liverpool, England made inquiries into his prior record of employment and his activities during World War II. At that time Balsys voluntarily responded to such questioning, and testified under oath regarding the nature of his wartime activities in Europe and his immigration to the United States. Balsys's answers to questions about his whereabouts and activities from 1934 to 1944, whether given in 1961 or today, are part of the same proceeding. Therefore, this Court concludes that Balsys's representations to immigration authorities constituted a waiver of any Fifth Amendment privilege which he now claims in response to questions posed by the OSI concerning his procurement of a United States immigrant visa.

### IV. Production of Documents

■ Balsys has also invoked the Fifth Amendment privilege in refusing to produce the documents described in the subpoena. Although the privilege generally does not apply to requests to produce documents, the very act of producing the documents may have "communicative aspects which rise to the level of a testimonial communication, as where merely acknowledging possession of the documents would be an incriminating admission." Matter of Grand Jury (Markowitz), 603 F.2d 469, 477 (3d Cir.1979). See also United States v. Doe, 465 U.S. 605, 612, 104 S.Ct. 1237, 1242, 79 L.Ed.2d 552 (1984) (noting that act of production may be testimonial). Balsys has made no showing, however, that the production of such documents would be testimonial in nature. See Matter of Grand Jury (Markowitz), 603 F.2d at 476 ("A witness who produces preexisting documents pursuant to subpoena does not testify as to all facts which the documents themselves may reveal.").

### CONCLUSION

For the reasons stated above, the government's motion for an order compelling compliance with its administrative subpoena is hereby GRANTED with respect to both the deposition questions the OSI wishes to ask of the Respondent and the documents described in the subpoena.

SO ORDERED.