**UNITED STATES of America,
Petitioner–Appellee,**

v.

**Aloyzas BALSYS, Respondent–Appellant.**

**No. 504, Docket 96–6144.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1996.

Decided July 15, 1997.

Ivars Berzins, Babylon, NY, for Respondent–Appellant.

Robert G. Seasonwein, Office of Special Investigations, United States Department of Justice, Criminal Division (Susan L. Siegal; Eli M. Rosenbaum, of counsel) Washington, DC, for Petitioner–Appellee.

Before: MESKILL and CALABRESI, Circuit Judges, and BLOCK, District Judge.*

CALABRESI, Circuit Judge, with whom Judge BLOCK joins:

Aloyzas Balsys appeals from a decision and order of the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., *Judge*), entered on March 13, 1996, granting the government's motion for an order compelling compliance with a Department of Justice Office of Special Investigations ("OSI") administrative subpoena that sought answers to deposition questions and requested documents as part of an investigation into whether Balsys lied on his immigration application about his activities during WWII.

In this appeal, we are asked to consider two questions that delineate the scope of the Fifth Amendment privilege against self-incrimination. First, we must determine whether the privilege protects a witness from being compelled to testify where there is a real and substantial risk that the testimony, or the evidence derived therefrom, will be used against him in a foreign criminal prosecution. Second, we must decide whether an alien's voluntary statements on an application for an entry visa to the United States constitute a waiver of the Fifth Amendment with respect to a deportation investigation concerning those statements.

We find that the language and purposes of the Fifth Amendment are best followed by allowing a witness with a real and substantial fear of foreign prosecution to invoke the privilege against self-incrimination in domestic proceedings, that permitting the privilege in such cases need not hamper the legitimate goals of the United States to a significantly greater degree than does invocation of the privilege in the face of domestic prosecution, and that this interpretation of the privilege is most consistent with the precedents of the Supreme Court and of this court. We also conclude that Balsys did not waive his right to invoke the privilege by completing a visa application in 1961. Accordingly, we vacate the district court's order.

## BACKGROUND

Aloyzas Balsys is a resident alien currently living in Woodhaven, New York. He was born on February 6, 1913 in Lithuania and entered the United States on June 30, 1961. In his application for Immigrant Visa and Alien Registration, Balsys stated that between 1934 and 1940, he served in the Lithuanian army, and that between 1940 and 1944 he lived in Lithuania in hiding. As part of that application, Balsys swore that the information contained in his application for Immigrant Visa and Alien Registration was true. The application also included a declaration that Balsys understood that if he made any willfully false or misleading statements or concealed any material fact, and he entered the United States, he could be subject to criminal prosecution and/or deportation.

OSI is an arm of the Criminal Division of the United States Department of Justice. It was created to investigate and institute denaturalization and deportation proceedings against suspected Nazi war criminals. It claims to have evidence that Balsys assisted the Nazi forces occupying Lithuania during World War II and that he persecuted Jews and other civilians as a member of the Lithuanian Security Police. If Balsys did assist the Nazi forces and persecute Jews and other civilians, he might be eligible for deportation, pursuant to 8 U.S.C. §§ 1182(a)(3)(E), 1251(a)(4)(D), for persecuting persons because of their race, religion, national origin or political opinion, as well as pursuant to 8 U.S.C. §§ 1182(a)(6)(c)(i), 1251(a)(1)(A), for lying on his immigration application.

In furtherance of its investigation of Balsys's wartime activities, OSI issued an administrative subpoena commanding Balsys to give testimony and to produce documents relating to his activities during the war and to his immigration to the United States. Balsys appeared at a deposition, and provided his name and address; he then asserted

---

* The Honorable Frederic Block, of the United States District Court for the Eastern District of New York, sitting by designation.

the Fifth Amendment privilege and refused to answer all other questions. These questions addressed, *inter alia,* his residence in Europe during the war, his association with Lithuanian police units and political groups, and his knowledge of and participation in the adverse treatment of Jews and others during the Nazi occupation of Lithuania. The only document he produced was his alien registration card. The United States brought suit in the district court to enforce the administrative subpoena.

Balsys argued to the district court that he is entitled to assert the privilege against self-incrimination because his answers could subject him to prosecution by the governments of Lithuania, Germany, and Israel. The government argued that Balsys had not demonstrated a real and substantial fear of foreign prosecution, that the privilege is inapplicable where the claimant fears prosecution by a foreign government, and that Balsys had waived his privilege.

In *United States v. Balsys,* 918 F.Supp. 588 (E.D.N.Y.1996), the district court granted the petition for enforcement of the subpoena and ordered Balsys to testify. It held that Balsys does, in fact, face a real and substantial danger of foreign prosecution in Lithuania and in Israel because: (1) the responses OSI sought from Balsys could incriminate him under both Lithuania's statute punishing Nazis and Nazi collaborators for crimes committed against the Lithuanian people during World War II and Israel's law imposing the death penalty for those who committed crimes against the Jewish people, in countries like Lithuania, during the Nazi regime; (2) Balsys's testimony would very likely be disclosed to Israel and Lithuania, since part of OSI's mandate is to "[m]aintain liaison with foreign prosecution, investigation and intelligence offices," Order of Att'y Gen. No. 851–79 (Sept. 4, 1979), since OSI has an agreement to collect and provide Lithuanian authorities with evidence on suspected Nazi collaborators, and since OSI has "shared similarly incriminative evidence with Israel in the past," *Balsys,* 918 F.Supp. at 596; and (3) if Balsys gives the answers OSI seeks, he could be deported to these countries.

The district court then considered whether Balsys could invoke the Fifth Amendment to avoid providing testimony and documents that might aid the potential foreign prosecutions. The court relied on *United States v. Lileikis,* 899 F.Supp. 802 (D.Mass.1995), which stated:

> If a governmental interest in enforcing the organic laws of the United States is involved, and the United States has a legitimate need for a witness's testimony in furthering that interest, the privilege must yield if the sole basis for claiming its protections is the fact that a resident of the United States faces the likelihood of a foreign prosecution. It would be an unacceptable affront to the sovereignty of the United States if the operation of its laws could be stymied by the desire of a foreign government to prosecute the same witness.

*Id.* at 809. Following this reasoning, the district court held that Balsys could not invoke the privilege since the United States government sought his testimony out of a legitimate interest in a matter of domestic law, namely, investigating Balsys's alleged lies on his application for entry:

> In declining to extend the Fifth Amendment privilege in the present case, the Court concludes that the fundamental purpose of the privilege is to protect individuals against governmental overreaching. Balsys seeks to assert the privilege as a means to thwart the enforcement of domestic law. This is contrary to the values the Fifth Amendment was intended to protect. Although Balsys may suffer harm as a result of the incriminating nature of the disclosure, the government has a valid purpose. . . .
>
> A contrary decision by this Court would allow individuals attempting to immigrate to the United States to misrepresent their personal histories and other relevant information in order to gain access to this country, leaving the government without recourse and seriously eroding domestic law enforcement. Accordingly, the Court concludes that Respondent is not entitled

to invoke the Fifth Amendment privilege against compelled self-incrimination.

*Balsys*, 918 F.Supp. at 599–600.

Lastly, the district court held that even if Balsys were entitled to assert the privilege, he waived that privilege when he first applied for immigration. The court found that, in applying for a visa in 1961, Balsys initiated an immigration proceeding, that this proceeding remained open, and that the visa application and current OSI investigation were therefore parts of the same proceeding. Since voluntary statements given on a subject during a single proceeding create an implied waiver with respect to that subject, the court found that Balsys had waived his Fifth Amendment privilege when, in his 1961 application, he answered questions concerning his activities during World War II. *See id.* at 600.

On appeal, Balsys challenges the district court's conclusion that he may not invoke the Fifth Amendment privilege to avoid giving evidence that could be used against him in a foreign prosecution, and denies that he waived the privilege when he completed the visa application before his entry to the United States. Neither party challenges the finding that Balsys has a real and substantial danger of prosecution by Lithuania and Israel, and an uncertain risk of prosecution by Germany.

## DISCUSSION

### I. The Privilege Against Self–Incrimination and the Fear of Foreign Prosecution

■ The Fifth Amendment provides in part: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend V. Resident aliens, like Balsys, have the same rights under the Fifth Amendment as citizens, *see Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 & n. 5, 73 S.Ct. 472, 478 & n. 5, 97 L.Ed. 576 (1953), and thus may invoke the privilege to the same extent as citizens. The privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administra-

tive or judicial, investigatory or adjudicatory," in which the witness reasonably believes that the information sought, or the evidence discovered as a result of that information, could be used against him in a subsequent criminal prosecution. *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1655–56, 32 L.Ed.2d 212 (1972); *see also Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 817, 95 L.Ed. 1118 (1951).

■ The deposition at which Balsys asserted the privilege was part of an investigation into whether Balsys is deportable. Since a deportation proceeding is a civil action and not a criminal prosecution, *see INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3482–83, 82 L.Ed.2d 778 (1984), Balsys does not have a Fifth Amendment right to refuse to answer questions posed to him for fear that such information might be used to deport him. He would, nevertheless, clearly have a right to refuse to answer the questions if the information could be used against him in a criminal case in the United States. Balsys does not claim to be at risk of such domestic criminal prosecution. Instead, he asserts (and the government does not deny on appeal) that he has a real and substantial fear of prosecution by Lithuania and Israel. The language of the Fifth Amendment makes no distinction between self-incrimination in domestic and in foreign prosecutions. The privilege would therefore seem to apply to Balsys. The government nevertheless argues that the Fifth Amendment privilege does not protect against self-incrimination in foreign criminal trials. And so the question facing this court is whether fear of foreign prosecution gives Balsys the right to refuse to answer questions in a domestic deportation proceeding.

### A. Direct Case Law

In answering this question, we have no explicit guidance from either the Supreme Court or from this court. Although the issue was before the Supreme Court in *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972),[1] the Court held that since no "real

1. The Supreme Court had previously granted certiorari in a case in which a circuit court had

and substantial" risk of foreign prosecution existed in that case, it was unnecessary to decide the question. *See id.* at 478–81, 92 S.Ct. at 1674–76.[2] Since *Zicarelli,* and until this case, this court has never had to reach the issue, because each of the claimants advancing the argument lacked the real and substantial fear of foreign prosecution required by the Supreme Court. *See, e.g., United States v. Chevrier (In re Grand Jury Proceedings),* 748 F.2d 100, 104–05 (2d Cir. 1984); *United States v. Gilboe, (In re Gilboe),* 699 F.2d 71, 74–75 (2d Cir.1983); *United States v. Flanagan (In re Flanagan),* 691 F.2d 116, 121–22 (2d Cir.1982).

Three other circuits have considered whether the Fifth Amendment privilege applies to fear of incrimination in foreign countries, and they have come to divergent conclusions.

In *United States v. (Under Seal) (Araneta),* 794 F.2d 920 (4th Cir.1986), the Fourth Circuit held that the Fifth Amendment does not protect a witness facing a substantial risk of foreign prosecution from compelled self-incrimination. It reasoned that when the Fifth Amendment applied only to the federal government, and not to the states, the Supreme Court had held that the amendment did not forbid the federal government from compelling testimony that would incriminate a witness under state law or forbid a state government from compelling testimony that

would incriminate the witness under federal law. Since "[o]nly when the Fifth Amendment was held applicable to the states was the privilege held to protect a witness in state or federal court from incriminating himself under either federal or state law," the court concluded "that the Fifth Amendment privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment from compelling self-incrimination." *Araneta,* 794 F.2d at 926 (citation omitted). The Fourth Circuit has since reaffirmed this holding in *United States v. (Under Seal),* 807 F.2d 374, 375–76 (4th Cir.1986) (per curiam).

The Tenth Circuit also held in a brief opinion that the Fifth Amendment does not protect against self-incrimination for acts made criminal by the laws of a foreign nation. *See In re Parker,* 411 F.2d 1067 (10th Cir.1969), *vacated as moot sub nom., Parker v. United States,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970).[3] The court stated:

> The ideology of some nations considers failure itself to be a crime and could provide punishment for the failure, apprehension, or admission of a traitorous saboteur acting for such a nation within the United States. In such a case the words "privilege against self-incrimination," engraved in our history and law as they are, may

held that a witness has no right to invoke the privilege to avoid incriminating himself in a foreign prosecution. But the court never ruled on this issue. *See Parker v. United States,* 397 U.S. 96, 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970). Instead, it vacated and remanded the case to the Tenth Circuit with instructions to dismiss the appeal as moot. *Id.*

**2.** In *Araneta v. United States,* 478 U.S. 1301, 107 S.Ct. 1, 92 L.Ed.2d 751 (1986), responding to an application for a stay of a contempt order pending certiorari, Chief Justice Burger, acting as Circuit Justice, briefly addressed the issue. He granted the stay on the ground that "there is a 'fair prospect' that a majority of this Court will decide the issue in favor of the applicants." *Id.* at 1304, 107 S.Ct. at 2. Since the petition for a writ of certiorari was later denied, the stay was lifted, and the court did not consider the question. *See Araneta v. United States,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).

Before the petition for certiorari in *Araneta* was denied, Justice Stevens, following the Chief

Justice, also stayed the enforcement of a contempt order entered when a witness refused to testify at a deposition despite a grant of immunity because he feared that the testimony could be used against him in a criminal proceeding by the Soviet Union. *See Mikutaitis v. United States,* 478 U.S. 1306, 1308–09, 107 S.Ct. 3, 4–5, 92 L.Ed.2d 756 (1986). On the same day certiorari was denied in *Araneta,* the Court vacated the stay entered by Justice Stevens. *See Mikutaitis v. United States,* 479 U.S. 911, 107 S.Ct. 310, 93 L.Ed.2d 285 (1986).

**3.** Although the Tenth Circuit opinion in *Parker* was vacated, it remains persuasive authority to the Tenth Circuit. *See, e.g., Nigro v. United States (In re Grand Jury Proceeding 82–2),* 705 F.2d 1224, 1227 (10th Cir.1982). We consider the decision in this light. *See United States v. Gecas,* 50 F.3d 1549, 1563 n. 22 (11th Cir.1995), *reh'g en banc granted, op. vacated,* 81 F.3d 1032 (11th Cir.1996).

turn sour when triggered by the law of a foreign nation.

*Id.* at 1070 (footnote omitted).

The Eleventh Circuit considered the issue in a case with facts very similar to those in the case before us. *See United States v. Gecas*, 50 F.3d 1549 (11th Cir.1995), *reh'g en banc granted, op. vacated*, 81 F.3d 1032 (11th Cir.1996). Vytautas Gecas invoked the privilege during a deposition by OSI that was part of a investigation into whether Gecas, a resident alien, lied on his visa application in 1962 about his activities in Lithuania during World War II. Reasoning that the Fifth Amendment has multiple purposes, which include protecting individual dignity as well as preventing overzealous prosecution, a panel of the Eleventh Circuit permitted Gecas to invoke the privilege. Allowing the privilege where the fear of foreign prosecution is real and substantial promotes, the court concluded, an appropriate balance between these purposes and the important government interest in domestic law enforcement. *See id.* at 1564–65.

A number of district courts, in this circuit and elsewhere, have also considered the question that the court faces today. In 1972, after the Supreme Court in *Zicarelli* had indicated that the issue remained open, Chief Judge Newman of this court, then a district court judge for the District of Connecticut, held that, when a witness has a reasonable fear of foreign prosecution, he can invoke the privilege against self-incrimination, despite a grant of use immunity. *See In re Cardassi*, 351 F.Supp. 1080, 1086 (D.Conn.1972). In reaching that conclusion, Judge Newman relied heavily on the earlier Supreme Court opinion in *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). *See Cardassi*, 351 F.Supp. at 1084–86. His ruling was not appealed. Another member of this court also addressed this issue as a district court judge. In *In re Flanagan*, 533 F.Supp. 957 (E.D.N.Y.), *rev'd on other grounds*, 691 F.2d 116 (2d Cir.1982), Judge McLaughlin, then of the Eastern District of New York, found that Martin Flanagan had a real and substantial fear of being prosecuted in the Republic of Ireland or in Northern Ireland for being a member of the Irish Republican Army, and went on to hold that the privilege could be invoked in the face of such a fear. *See id.* at 962–66. This court, however, held that the district court had erred in finding a real and substantial fear of foreign prosecution. We therefore reversed the district court without reaching the issue of the applicability of the privilege. *See Flanagan*, 691 F.2d at 121–22.

District courts in other circuits have also found the privilege to extend to fear of foreign prosecution. *See, e.g., Moses v. Allard (In re Moses)*, 779 F.Supp. 857, 870–83 (E.D.Mich.1991) (refusing in a domestic bankruptcy proceeding to compel the testimony of a debtor who feared prosecution in Switzerland); *Yves Farms, Inc. v. Rickett*, 659 F.Supp. 932, 939–41 (M.D.Ga.1987) (holding that a foreign citizen was entitled to invoke the Fifth Amendment privilege against private-party defendants seeking testimony on a collateral issue); *Mishima v. United States*, 507 F.Supp. 131, 135 (D.Alaska 1981) (relying on the analysis of English common law in *Murphy* to conclude that the privilege could be invoked where a real fear of foreign prosecution exists). And a number of district courts have found the privilege applicable in the particular context of OSI investigations. *See, e.g., United States v. Kirsteins*, No. 87–CV–964, 1989 WL 49796, at *10 (N.D.N.Y. May 10, 1989) (noting an earlier decision to allow the witness to invoke the privilege); *United States v. Trucis*, 89 F.R.D. 671, 673 (E.D.Pa.1981) (Pollak, *J.*) (relying on Judge Newman's discussion in *Cardassi*). But other district courts have refused to allow the privilege to be invoked against questioning by OSI. *See, e.g., Lileikis*, 899 F.Supp. at 809 (holding that the privilege cannot be asserted if there is a governmental interest in enforcing domestic law and the witness's testimony furthers that interest).

Although the Supreme Court has not squarely addressed the issue faced by this court today, the Court has considered an analogous and related issue: whether "one jurisdiction in our federal structure may compel a witness to give testimony which might incriminate him under the laws of

another jurisdiction." *Murphy,* 378 U.S. at 54, 84 S.Ct. at 1596. The Court's answer to this question guides us in two ways. First, like the Supreme Court in *Murphy,* we will begin by considering the question in the light of the purposes of the Fifth Amendment, and then in the light of Supreme Court cases and of English common law. Second, the *Murphy* decision, in and of itself, provides considerable support for the holding that the Fifth Amendment protects Balsys from being compelled to testify.

### B. The Purposes of the Fifth Amendment

Although the district court noted that the Fifth Amendment has a "role in preserving an individual's privacy and dignity," it determined "that the fundamental purpose of the privilege [against self-incrimination] is to protect individuals against governmental overreaching." *Balsys,* 918 F.Supp. at 598–99. The court went on to conclude that, since Balsys asserted the privilege in order to "thwart the enforcement of domestic law," and since "the government has a valid purpose," and there is no evidence of "malicious" or " 'overzealous prosecution,' " allowing Balsys to assert the privilege would undermine the values the Fifth Amendment was intended to protect. *Id.* at 599.

We disagree.

The origins and history of the Fifth Amendment are complex and controversial. *See, e.g.,* Leonard W. Levy, *Origins of the Fifth Amendment: The Right Against Self–Incrimination* (1968); R.H. Helmholz, *Origins of the Privilege Against Self-incrimination: The Role of the European Ius Commune,* 65 N.Y.U. L.Rev. 962 (1990); John H. Langbein, *The Historical Origins of the Privilege Against Self–Incrimination at Common Law,* 92 Mich. L.Rev. 1047 (1994); John H. Wigmore, *The Privilege Against Self–Crimination; Its History,* 15 Harv. L.Rev. 610 (1902). And its purposes are myriad and difficult to divine. *See Murphy,* 378 U.S. at 56–57 n. 5, 84 S.Ct. at 1597 n. 5; Akhil Reed Amar & Renee B. Lettow, *Fifth Amendment First Principles: The Self–Incrimination Clause,* 93 Mich. L.Rev. 857,

857–58 ("The Self–Incrimination Clause of the Fifth Amendment is an unsolved riddle of vast proportions, a Gordian knot in the middle of our Bill of Rights. From the beginning it lacked an easily identifiable rationale.... Today, things are no better: the clause continues to confound and confuse.").

■ Nevertheless, the Supreme Court has stated that its purposes include:

> our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the load; our respect for the inviolability of the human personality and of the right of each individual to a private enclave where he may lead a private life; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent.

*Murphy,* 378 U.S. at 55, 84 S.Ct. at 1596 (citations and internal quotation marks omitted). We are told, therefore, that the Fifth Amendment serves three categories of purposes: it advances individual integrity and privacy, it protects against the state's pursuit of its goals by excessive means, and it promotes the systemic values of our method of criminal justice. Rather than attempt to determine a single cardinal purpose of the Fifth Amendment and consider the question before us only in relation to that purpose, as the district court essentially did, we are bound to recognize the multiple values that the Supreme Court has found the privilege against self-incrimination to serve, and to consider whether allowing those who have reasonable fear of foreign prosecution to invoke the privilege "promotes or defeats [these] policies and purposes." *Id.*[4]

---

**4.** [T]he privilege against self-incrimination repre-    sents many fundamental values and aspira-

**130**

### 1. Individual Dignity and Privacy Values

Permitting a witness to invoke the Fifth Amendment to avoid incriminating himself in a foreign criminal case works to protect the dignity and privacy of the individual every bit as much as allowing the privilege in cases where the fear is of domestic prosecution. The Supreme Court has repeatedly emphasized the need to avoid imposing the "cruel trilemma" of self-accusation, perjury, or contempt, *see, e.g., Pennsylvania v. Muniz,* 496 U.S. 582, 595–97, 110 S.Ct. 2638, 2646–47, 110 L.Ed.2d 528 (1990); *South Dakota v. Neville,* 459 U.S. 553, 561–64, 103 S.Ct. 916, 921–22, 74 L.Ed.2d 748 (1983), and this trilemma is no less cruel nor any less imposed by a government within the United States merely because the testimony is ultimately used by a foreign nation. Nor is the threat to the "the human personality" and privacy any less serious simply because the compulsion serves the purposes of a foreign government. Finally, the privilege protects the innocent and better ensures the reliability of the testimony the United States seeks to compel regardless of whether the witness from whom the information is sought fears foreign or domestic prosecution, since self-incriminating statements are no more reliable in either case.

### 2. Values of the American Criminal Justice System

The systemic policies of American criminal justice that underly the Fifth Amendment are neither promoted nor inhibited by allowing the privilege to be invoked in cases of fear of foreign prosecution. Although we value an accusatorial system, a "fair state-individual balance" in criminal trials, and trial evidence of the highest reliability, *our* practice of these values is unaffected one way or the other when a witness fears foreign prosecution. This factor is, therefore, of no real significance in cases of this sort.

### 3. Values of Preventing Governmental Overreaching

The question of how applying the privilege in cases of fear of foreign prosecution affects the Fifth Amendment's purpose of avoiding governmental overreaching is more complicated. The district court reasoned that since Balsys faces no domestic prosecution, "there is no incentive for the government to elicit self-incriminating statements from Balsys by 'inhumane treatment and abuses.'" *Balsys,* 918 F.Supp. at 599 (quoting *Murphy,* 378 U.S. at 55, 84 S.Ct. at 1596). Admittedly, there is less of a motive for a government to treat a witness inhumanely in order to extract admissions when that same government is not seeking to prosecute the witness. "Conviction hunger"[5] seems unlikely when the prosecution does not intend to eat. We believe, however, that the district court underestimated the danger that exists where the fear is of prosecution in foreign lands.

First, a domestic government's interest in extracting admissions in aid of foreign prosecutions is more analogous to a domestic jurisdiction's interest in the criminal prosecution of a witness by another domestic jurisdiction than it is to the situation in which the "extracting" government has no interest in prosecution at all. In *Murphy,* the Court suggested that the purpose of avoiding governmental abuse was best served by preventing states and the federal government from compelling testimony that might incriminate the witness in a court of another jurisdiction. This is because there is frequently a "cooperative federalism" between the several states and the nation, as a result of which the federal and state governments wage "a united front against many types of criminal activity." *Murphy,* 378 U.S. at 56, 84 S.Ct. at 1597.

International collaboration in criminal prosecutions has intensified admirably in re-

tions.... It will not do, therefore, to assign one isolated policy to the privilege and then to argue that since "the" policy may not be furthered measurably by applying the privilege [in a particular way], it follows that the privilege should not be so applied.

*Murphy,* 378 U.S. at 56–57 n. 5, 84 S.Ct. at 1597–98 (criticizing Wigmore's rejection of the appli-

cability of the privilege where the prosecution is foreign).

**5.** This is the label Wigmore used to describe the motive of a government to engage in "inhumane treatment of persons from whom information is desired." *See Murphy,* 378 U.S. at 56 n. 5, 84 S.Ct. at 1596 n. 5 (citing 8 J. Wigmore, *Evidence* § 2251, at 317 (McNaughton rev. ed.1961)).

cent years. *See New MLAT Treaties Increase DOJ's Reach*, 4 No. 7 DOJ Alert 7, April 18, 1994, (discussing rise in United States cooperation with foreign nations to produce criminal evidence); Ethan A. Nadelman, *Cops Across Borders: the Internationalization of U.S. Criminal Law Enforcement* (1993); M. Cherif Bassiouni, *Policy Considerations on Inter–State Cooperation in Criminal Matters*, 4 Pace Y.B. Int'l L. 123, 130 (1992) (discussing the increase in cooperation among national and international police agencies since 1960's); Dominic Bencivenga, *International Antitrust Bilateral Pacts Seen As Crucial to Enforcement*, N.Y.L.J, December 12, 1996 at 5; *U.S. Mutual Legal Assistance Treaties Continue Proliferating*, Money Laundering Alert, 1996 WL 8687221 (May 1, 1996); Bruce Zagaris, *International Criminal and Enforcement Cooperation in the Americas in the Wake of Integration*, 3 Sw. J.L. & Trade Am. 1 (1996) (reviewing criminal enforcement cooperation mechanisms in the Americas). And what might be called "cooperative internationalism" has now begun to parallel the "cooperative federalism" described in *Murphy*. This eminently desirable development leads to the conclusion that, since the United States *does* have a significant stake in many foreign criminal cases, we can best avoid governmental abuse by allowing witnesses to avoid being compelled to answer questions posed by the government at home for fear of incriminating themselves abroad.

Second, as this case demonstrates, there is considerable correlation between the cases in which a witness is most likely to be able to demonstrate a real and substantial fear of foreign prosecution and the cases in which the purpose of preventing government overreaching would best be served by permitting the privilege. The United States government has manifested a substantial interest in the success of Balsys's foreign prosecution, an interest that makes that foreign prosecution significantly more likely. For example, according to the district court—and neither party has challenged its analysis in this regard—Balsys has a real and substantial fear of foreign prosecution in large part precisely because (1) "OSI was created for the sole purpose of investigating and gathering evidence of alleged Nazi collaborators residing in the United States illegally, and taking legal action to denaturalize, deport or prosecute them," (2) "OSI has entered into an agreement to provide evidence that it has gathered on suspected Nazi collaborators to Lithuania," and (3) OSI has exchanged incriminating evidence on suspected Nazi collaborators with Israel on past occasions. *See Balsys*, 918 F.Supp. at 595–97 (citing the order of the Attorney General establishing OSI, Order of Att'y Gen. No. 851–79 (Sept. 4, 1979), and a Memorandum of Understanding Between the United States Department of Justice and the Office of the Procurator General of the Republic of Lithuania Concerning Cooperation in the Pursuit of War Criminals, August 3, 1992, U.S.—Lithuania); *see also Gecas*, 50 F.3d at 1557–61 (concluding that Gecas had a real and substantial fear of foreign prosecution for substantially the same reasons).

In the presence of such facts, it would be odd indeed to suggest that the United States government does not care about foreign prosecutions and hence that allowing witnesses to invoke the privilege does not discourage governmental overreaching. Indeed, it is precisely in cases in which the United States' interest is strongest that the evidence will most probably be shared. In the same cases, in part because of the sharing of evidence, the witness will most likely be able to show a real fear of foreign prosecution. There is thus a strong correlation between the cases in which the government has an interest and the cases in which the witness will be able to use the privilege. It follows that permitting the privilege in such cases will help curb any tendency by the United States to take abusive measures just as it does in cases in which domestic prosecution is feared. For these reasons, we reject the district court's argument that allowing Balsys the privilege would not further the Fifth Amendment purpose of avoiding governmental overreaching.

The district court also erred when, following *Lileikis* it suggested that it is relevant to the application of the privilege that "[t]here is no indication that the government's motive is malicious, or that the government is en-

gaging in overzealous prosecution." *Balsys,* 918 F.Supp. at 599. The *Lileikis* court held that as long as the United States has a legitimate need for a witness's testimony to further a governmental interest in enforcing domestic law, and there is no evidence of improper motivation, the privilege must yield. *Lileikis,* 899 F.Supp. at 808–09. This holding, however, is contrary to both the purposes and the structure of the protection provided by the Fifth Amendment.

The exact same argument—if it were valid—would apply to invocations of the privilege in cases of fear of domestic prosecution. In almost all situations in which a witness in a civil proceeding claims the privilege, there exists a significant domestic law interest in obtaining the information. And yet the privilege perdures. Similarly, it is rare in such cases that one can show either overzealous prosecution or improper motivation. But no such showing is required. The privilege applies in such instances because the Fifth Amendment is fundamentally preventative. It prevents the government from using compelled testimony in the class of the cases—criminal prosecutions—in which the government's interest in the information might most tempt it to abuse witnesses. It does this at the cost of possibly limiting information gathering in other contexts, including civil cases. The point of the privilege is to *preempt* government abuse, rather than to seek to deter abuse by punishing it after it has occurred.

The question is not, therefore, as *Lileikis* suggests, whether the government can state some legitimate interest in the testimony it seeks, or whether governmental overreaching can be shown. It is rather whether cases involving fear of foreign prosecution—as a class—involve circumstances in which the application of the Fifth Amendment would preempt abuse and thereby promote constitutional goals. More directly, the question is whether, in this respect, cases involving fear of foreign prosecution differ significantly from cases involving domestic prosecutions. As we have noted, the United States will frequently have the same opportunity and the same temptations when a witness faces prosecution abroad as in cases involving fear of prosecution by another do-

mestic jurisdiction. It follows that applying the privilege in both sets of cases achieves the same functions at the same costs. In both contexts, the Fifth Amendment inhibits the pursuit of government goals—in spite of their legitimacy and importance—in order to deny the government an inducement to use inappropriate methods to achieve those ends.

*C. The Supreme Court, English Common Law, and the Privilege Against Self-Incrimination*

In *United States v. Murdock,* 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), the Supreme Court held that the federal government could compel a witness to give testimony that might incriminate him under state law. In support of this holding the Court cited English common law, stating "[t]he English rule of evidence against compulsory self-incrimination, on which historically, that contained in the Fifth Amendment rests, does not protect witnesses against disclosing offenses in violation of the laws of another country." *Id.* at 149, 52 S.Ct. at 64. Thirty-three years later (on the very same day that the Court held in *Malloy v. Hogan,* 378 U.S. 1, 3, 84 S.Ct. 1489, 1490, 12 L.Ed.2d 653 (1964), that the Fifth Amendment privilege against self-incrimination applies to the States through the Fourteenth Amendment), the Court in *Murphy* rejected the basis, the reasoning, and the holding of *Murdock.*

In *Murphy,* the Court held that the privilege against self-incrimination protects a witness in one domestic jurisdiction against being compelled to give testimony that could be used to convict him in another domestic jurisdiction. Part of the Court's justification for this rejection of the *Murdock* rule was that the *Murdock* Court had incorrectly stated the relevant English common law rule. The *Murdock* Court had asserted that the English common law rule could be found in *King of the Two Sicilies v. Willcox,* 1 Sim. (N.S.) 301, 61 Eng. Rep. 116 (Ch. 1851). The *Murphy* Court concluded instead that *United States of America v. McRae,* L.R., 3 Ch.App. 79 (Ch.App.1867), which held that *where a witness is under threat of foreign prosecution the privilege applies as much as where the witness is exposed to that threat under*

*English law*, reflected "the settled 'English rule' regarding self-incrimination under foreign law." *Murphy*, 378 U.S. at 63, 84 S.Ct. at 1600. Thus, the *Murphy* Court rejected the conclusion that the "only danger to be considered is one arising within the same jurisdiction and under the same sovereignty." and ultimately "accept[ed] as correct the construction given the privilege by the English courts" namely, that the privilege may be invoked by witnesses attempting to avoid incriminating themselves abroad. *Murphy*, 378 U.S. at 68, 77–78, 84 S.Ct. at 1603, 1608–1609 (internal quotation marks omitted).[6]

The Supreme Court's statement and acceptance of the English common law rule suggests that the Court has endorsed the proposition we accept today, that a witness may invoke the Fifth Amendment out of fear of a foreign prosecution. *See Trucis*, 89 F.R.D. at 673; *Mishima*, 507 F.Supp. at 134–35; *Cardassi*, 351 F.Supp. at 1085. *But see Parker*, 411 F.2d at 1070 (stating that the Supreme Court relied on English common law regarding foreign prosecutions only as an "argumentative analogy" to the relationship between the federal government and the states). Although the discussion of English common law in *Murphy* does not decide the case before us, as demonstrated by the fact that the Court considered the question an open one in *Zicarelli*, it does provide significant support for our conclusion. *See Araneta v. United States*, 478 U.S. 1301, 1303–04, 107 S.Ct. 1, 2, 92 L.Ed.2d 751 (1986) (Chief Justice Burger acting as Circuit Justice in granting stay of contempt order) ("*Murphy v. Waterfront Comm'n of New York Harbor* contains dictum which, carried to its logical conclusion, would support" a ruling that "the privilege against self-incrimination protects a witness from being compelled to give testimony that may later be used against him in a foreign prosecution.") (citation omitted).[7]

## D. Application of the Privilege and United States Enforcement of Domestic Law

The district court viewed the potential effect of the privilege on domestic law enforcement as the primary obstacle to granting the privilege to those in Balsys's position. *See Balsys*, 918 F.Supp. at 599 ("[T]o allow Balsys to invoke the privilege would unreasonably impinge on the government's ability to monitor and verify immigration and visa applications."). Other courts and commentators that have denied such witnesses the

---

**6.** It is evident from this analysis that the Supreme Court in *Murphy* believed *Murdock* to be incorrect *when it was written*. It did not simply find that *Murdock* became inapplicable in the light of subsequent legal developments. We therefore reject the Fourth Circuit's conclusion that the Fifth Amendment privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment. According to the Fourth Circuit's reasoning, *Murphy* would not have held the privilege to protect a witness from being compelled to testify in one domestic jurisdiction where the testimony could incriminate him in another if *Malloy* had not made the Fifth Amendment applicable to the states through the Fourteenth Amendment on the same day. *See Araneta*, 794 F.2d at 926. But the opinion in *Murphy* expressly (albeit in dicta) forecloses any such conclusion.

**7.** Some commentators and courts have suggested that the English common law rule was less certain than *Murphy* indicated. *See Araneta*, 794 F.2d at 927; Randall D. Gyunn, Note, *The Reach of the Fifth Amendment Privilege When Domestically Compelled Testimony May Be Used in a Foreign Country's Court*, 69 Va. L.Rev. 875, 893 (1983). Even assuming *arguendo* that this objection has merit, it is for the Supreme Court and not us to assess its significance. Moreover, the

Supreme Court plainly recognized, in both *Murphy* and *Murdock*, that there is a strong analogy between a domestic jurisdiction compelling testimony that may be used by another domestic jurisdiction and a domestic jurisdiction compelling testimony that may be used by a foreign jurisdiction. *See Murphy*, 378 U.S. at 57–72, 77–78, 84 S.Ct. at 1597–05, 1608–09; *Murdock*, 284 U.S. at 149, 52 S.Ct. at 64. Nothing about the Court's alleged error undermines that analogy. And there is no doubt that the Supreme Court continues to abide by the rule laid out in *Murphy* that the privilege may be invoked against a domestic jurisdiction seeking testimony that might incriminate in another domestic jurisdiction. Consequently, even if the Court were to retreat from its view on English law, it does not follow that it would fail to apply the privilege in cases of fear of foreign prosecution. Since the *Murphy* rule persists, and since the Supreme Court has indicated that the issue before us is analogous to the issue decided in *Murphy*, it follows that, regardless of what the English rule on witnesses who face foreign prosecution in fact was, the *Murphy* rule, by itself, provides significant support for the conclusion that the privilege against self-incrimination may be invoked to avoid incriminating oneself in a foreign criminal case.

privilege have been similarly concerned that granting the privilege would allow the priorities of foreign prosecutions to inhibit domestic law enforcement. *See, e.g., Araneta,* 794 F.2d at 926 ("It would be intolerable to require the United States to forego evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country."); *Lileikis,* 899 F.Supp. at 809 (stating that if the United States has a legitimate need for a witness's testimony, "[i]t would be an unacceptable affront to the sovereignty of the United States if the operation of its laws could be stymied by the desire of a foreign government to prosecute the same witness"); *Parker,* 411 F.2d at 1070; Diego A. Rotztain, Note, *The Fifth Amendment Privilege Against Self–Incrimination and Fear of Foreign Prosecution,* 96 Colum. L.Rev.1940, 1964 (1996).

This objection is significant because it contrasts the effects on domestic law enforcement of granting the privilege to those who fear criminal charges abroad with the effects of granting it to witnesses who fear prosecution at home. When a witness refuses to answer questions because he is afraid of domestic prosecution, the government is able to compel the testimony by offering the witness immunity from the use either of the testimony or of its fruits in a subsequent domestic criminal prosecution. *See Kastigar,* 406 U.S. at 449, 459, 92 S.Ct. at 1658, 1664. This immunity is enforced by the courts. Once a defendant establishes that he has testified under a grant of immunity, the court will exclude evidence in subsequent criminal proceedings unless the government proves that the evidence it proposes to use comes from a legitimate source independent of the compelled testimony. *See id.* at 460, 92 S.Ct. at 1664. Where a witness fears foreign criminal proceedings, under current law, the United States cannot grant effective immunity since our courts cannot ensure the exclusion of evidence from prosecutions abroad. Because allowing the privilege in the latter case allegedly deprives the government of the means of compelling testimony, the result is

said to be an unacceptable encroachment on the government's law enforcement efforts.

We find the strength of this objection to be exaggerated, and we conclude that it does not justify denying those who fear foreign prosecution the right to use the privilege.

The fact that allowing the privilege has costs for domestic law enforcement is not by itself a constitutional argument for disallowing the privilege. *See Cardassi,* 351 F.Supp. at 1086 ("Of course, a constitutional privilege does not disappear, nor even lose its normal vitality, simply because its use may hinder law enforcement activities. That is a consequence of nearly all the protections of the Bill of Rights, and a consequence that was originally and ever since deemed justified by the need to protect individual rights.").

> The effective enforcement of a well-designed penal code is of course indispensable for social security. But the Bill of Rights was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed.

*Feldman v. United States,* 322 U.S. 487, 489, 64 S.Ct. 1082, 1083, 88 L.Ed. 1408 (1944). It is the duty of the courts to enforce constitutional protections despite their costs.

It might nevertheless be argued that in deciding whether a constitutional right exists, a court may consider the effect that such a finding will have on legitimate government needs. For example, it could be said that, if the application of the privilege against self-incrimination that we consider today has a much greater negative effect on domestic law enforcement than does the traditional application of the privilege, this disparity might itself be relevant to what the words of the Framers should be taken to mean. The premise of this argument, however—that the interpretation of the privilege that we accept today would have a significantly greater adverse effect on the United States's ability to pursue domestic law enforcement goals than does its traditional application—is dubious.

### 1. The Conflict Rarely Arises [8]

In the first place, the circumstances giving rise to application of the privilege in cases involving foreign prosecutions rarely occur. Since the Supreme Court refused to consider the constitutional question twenty-five years ago in *Zicarelli*—finding that the witness had not established a real and substantial fear of foreign prosecution—only a handful of witnesses have managed to demonstrate such a fear. *See Gecas,* 50 F.3d at 1556–62; *Araneta,* 794 F.2d at 923–25; *United States v. Ragauskas,* No. 94 C. 2325, 1995 WL 86640, at *3–4 (N.D.Ill.1995); *Moses,* 779 F.Supp. at 861–870; *Trucis,* 89 F.R.D. at 673; *Mishima,* 507 F.Supp. at 132–33; *Cardassi,* 351 F.Supp. at 1083–84. In most cases, courts have found that the danger is "remote and speculative" and, hence, insufficient to justify the application of the privilege. *See, e.g., Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1064–65 (3d Cir. 1988), *aff'd on other grounds,* 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *United States v. Joudis,* 800 F.2d 159, 163–64 (7th Cir.1986); *In re President's Comm'n on Organized Crime,* 763 F.2d 1191, 1198–99 (11th Cir.1985); *Chevrier,* 748 F.2d at 104–05 (2d Cir.1984); *Gilboe,* 699 F.2d at 75–78; *Flanagan,* 691 F.2d at 121–24; *Nigro,* 705 F.2d at 1226–28; *In re Baird,* 668 F.2d 432, 434 (8th Cir.1982); *United States v. Yanagita,* 552 F.2d 940, 946–47 (2d Cir.1977); *In re Tierney,* 465 F.2d 806, 811–12 (5th Cir.1972).

This is likely to continue to be the case, as it is difficult to establish a real and substantial fear of criminal prosecution abroad. For example, one important factor in determining whether a witness has a real and substantial fear of foreign prosecution is whether, by extradition or deportation, he would likely "be forced to enter a country disposed to prosecute him." *Gecas,* 50 F.3d at 1560; *see also Balsys,* 918 F.Supp. at 596; *Flanagan,* 691 F.2d at 121. And few witnesses are, in fact, subject to either deportation or extradition.

Only aliens may be deported. *See* 8 U.S.C. § 1227.[9] And extradition generally requires the existence of an authorizing treaty. *See United States v. Alvarez–Machain,* 504 U.S. 655, 664, 112 S.Ct. 2188, 2193, 119 L.Ed.2d 441 (1992); *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 8–9, 57 S.Ct. 100, 102–03, 81 L.Ed. 5 (1936). Moreover, even if an extradition treaty exists linking the United States and the country in which a witness fears prosecution, the witness can be extradited to that country only for acts that would also be criminal in the United States.[10] For these reasons, and because of other barriers to showing a real and substantial fear of foreign prosecution, the class of witnesses who are likely to be eligible for the privilege under the interpretation Balsys advocates is very limited.

In the second place, even where a real and substantial fear of prosecution is established,

---

**8.** Judge Meskill in his opinion concurring in the result disassociates himself with this section because he deems it unnecessary to a resolution of this appeal. He is, of course, quite right that this section would not be needed if the appeal were to be resolved in the way that he suggests. This section is not superfluous, however, given the grounds of decision adopted by the majority.

**9.** It is also possible for the United States to bring a denaturalization proceeding to revoke the citizenship of a witness under some circumstances, such as where the citizenship was illegally procured or procured by concealment of a material fact. *See* 8 U.S.C. § 1451. After a witness is denaturalized, he may be deported as an alien. This process, however, generally takes much longer than extradition.

**10.** Traditionally, extradition treaties included a list of specific crimes for which extradition was provided. More recent extradition treaties negotiated by the United States require that the al-

leged crime for which extradition is requested be a crime in both countries *See* Marian Nash, *Modernization of Extradition Treaties,* 86 Am. J. Int'l L. 547, 547 (1992); M. Cherif Bassiouni, *International Extradition: United States Law and Practice,* 320, 324–27 (2d ed.1987); *LoDuca v. United States,* 93 F.3d 1100, 1111–12 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 399 (1996).

It follows that the fear expressed in *Parker* that strange foreign criminal laws could result in denying the United States access to testimony, *see Parker,* 411 F.2d at 1070, is unfounded since in such cases it is very unlikely that the witness would ever be forcibly subject to the jurisdiction threatening to prosecute him. *See* Moshe M. Sukenik, Note, *Testimony Incriminating Under the Laws of a Foreign Country—Is There a Right to Remain Silent?,* 11 N.Y.U. J. Int'l L. & Pol. 359, 369 (1978).

allowing the witness to invoke the privilege would often have little effect on domestic law enforcement. A witness may only use the privilege in response to questions the answers to which might "in themselves support a conviction" or "furnish a link in the chain of evidence needed to prosecute the claimant for a ... crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 817, 95 L.Ed. 1118 (1951). He may not maintain a general silence. Since the United States's interests in domestic law enforcement concern primarily *domestic* activities and foreign prosecutions concern primarily *foreign* activities, when what a witness fears is foreign prosecution, the information sought by the United States will usually not fall within the scope of the silence that the Fifth Amendment allows to that witness. *See Cardassi,* 351 F.Supp. at 1086.

In the third place, since an adverse inference may be drawn in civil cases when a witness invokes the privilege, that very invocation often aids the government's case at the same time that it deprives the government of the testimony it sought. In *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Supreme Court made clear that while the Fifth Amendment precludes the drawing of adverse inferences against defendants in criminal cases, it "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Id.* at 318, 96 S.Ct. at 1557. "This is so even though, as in *Baxter,* the government is a party to the action and would benefit from the drawing of the inference." *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997) (citing *United States v. Ianniello,* 824 F.2d 203, 208 (2d Cir.1987)).

It follows, for example, that since a deportation hearing is a civil proceeding, *see Lopez–Mendoza,* 468 U.S. at 1038–39, 104 S.Ct. at 3482–83 a resident alien, like Balsys, who refuses to answer questions that might incriminate him abroad takes a chance that he will create a negative inference that may be used in conjunction with other evidence to deport him. Invoking the privilege in the face of incriminating questions is probably not, *by itself,* sufficient to justify depriving a person of an important liberty interest. *See Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985). And freedom from deportation is such an interest. *See United States ex rel. Vajtauer v. Commissioner of Immigration,* 273 U.S. 103, 106, 47 S.Ct. 302, 303, 71 L.Ed. 560 (1927). But if there is other evidence, the witness's silence may contribute to a decision to deport the alien. *See United States v. Stelmokas,* 100 F.3d 302, 311 (3d Cir.1996) (stating that adverse inferences could be drawn in a denaturalization proceeding against an alleged Nazi collaborator from fact that he invoked his privilege against self-incrimination "as long as there was independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination"), *cert. denied,* — U.S. ——, 117 S.Ct. 1847, 137 L.Ed.2d 1050, (1997). The possibility of drawing adverse inferences, thus substantially reduces the effects on government law enforcement efforts of applying the privilege to those who fear incriminating themselves in foreign prosecutions.

Finally, the witness's testimony may not be the only source of the information the government seeks. And although the government might prefer to obtain the information directly from the witness, it may often be able to achieve its law enforcement goals by relying entirely on other sources of evidence.

### 2. Parallels to Immunity Statutes May Be Enacted

Nevertheless, we assume that there do exist a number of cases in which the testimony sought by the government will be (a) within the scope of the privilege possessed by a witness (b) who genuinely fears prosecution abroad, (c) in circumstances in which the witness's failure to testify would affect the government's interests adversely. There are domestic legal areas in which the United States has an important interest in a witness's testimony about events that occurred overseas. The present case provides the most common example. When a resident alien is alleged to have lied about criminal activities in which he engaged in a foreign

country, the United States may have a strong interest in excluding him from the United States, and the other country may have a strong interest in prosecuting him.[11] *See, e.g.,* Balsys, 918 F.Supp. at 592–97; *Gecas,* 50 F.3d at 1553–62. And even with a negative inference against him, the government may not have sufficient evidence to deport the witness without his own testimony.

We do not doubt, therefore, that applying the privilege to those who fear foreign prosecution will have some constraining effect—albeit less than the government suggests—on the government's pursuit of testimony. Even in such cases, however, the government can do much to minimize the costs to its law enforcement efforts, enough, indeed, so that those costs become analogous to those that occur in domestic prosecutions. For methods may exist by which the United States can constitutionally bypass the privilege either by eliminating the likelihood that the witness

will be sent to the jurisdiction that would prosecute him, or by granting some form of constructive immunity to the witness.

As we have indicated previously, in cases involving fear of domestic prosecution, immunity statutes have become, over time, not only "a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify," but also " 'part of our constitutional fabric.' " *Kastigar,* 406 U.S. at 446–47, 92 S.Ct. at 1656–57 (quoting *Ullmann v. United States,* 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956)). And while the government must provide protection "as comprehensive as the protection afforded by the privilege," *Kastigar,* 406 U.S. at 449, 92 S.Ct. at 1658 the Supreme Court has not stated that the combination of use and derivative-use immunity and the exclusionary rule is necessarily the only method for achieving this.[12] The way may be open, therefore, for the adoption of analogies to immunity stat-

---

**11.** Resident aliens suspected of Nazi activities are particularly likely to be able to establish a real and substantial fear of foreign prosecution because deportation from the United States may not be optional, *see* 8 U.S.C. §§ 1251(a)(4)(D), 1253(h); *Linnas v. INS,* 790 F.2d 1024, 1029 & n. 1 (2d Cir.1986) ("The deportation of Nazi persecutors is required even though the deportee's life or freedom might be threatened as a result."); *Balsys,* 918 F.Supp. at 596 (discussing mandatory deportation of Nazi persecutors), and because some countries have no statute of limitations on such crimes. *See, e.g.,* Law Concerning Responsibility for Genocide of the People of Lithuania, No. 1–2477 (1992) (Lithuania), *as translated in* Joint Appendix at 207 (indicating that Lithuania joins the November 26, 1968 Convention for the Non–Applicability of a Statute of Limitations for War Crimes and Crimes Against Humanity).

**12.** A number of courts have suggested that Federal Rule of Criminal Procedure 6(e)(2), which establishes the general rule that grand jury testimony is secret, eliminates any reasonable ground for fearing foreign prosecution, and therefore prevents grand jury witnesses who fear foreign prosecution from invoking the privilege. *See, e.g., In re Baker,* 680 F.2d 721, 721 (11th Cir. 1982) (per curiam); *Baird,* 668 F.2d at 433; *United States v. Brummitt,* 665 F.2d 521, 524–26 (5th Cir.1981); *United States v. Smith (In re Campbell),* 628 F.2d 1260, 1262 (9th Cir.1980); *United States v. Lemieux (In re Federal Grand Jury Witness),* 597 F.2d 1166, 1167 (9th Cir.1979) (per curiam); *United States v. Postal (In re Grand*

*Jury Proceedings),* 559 F.2d 234, 236–37 (5th Cir.1977); *In re Long Visitor,* 523 F.2d 443, 447 (8th Cir.1975); *United States v. Weir (In re Weir),* 495 F.2d 879, 881 (9th Cir.1974); *Tierney,* 465 F.2d at 811; *Parker,* 411 F.2d at 1069–70. *But see Araneta,* 794 F.2d at 925 (finding "the contrary authority to be more compelling"); *Chevrier,* 748 F.2d at 103–04; *Flanagan,* 691 F.2d at 123–24. Grand jury secrecy has many exceptions, however, and even when no exception applies, it largely depends on the largess of government officials who have access to grand jury minutes and of grand jurors who "might consciously or inadvertently leak confidential information." *Flanagan,* 691 F.2d at 123; *see also Cardassi,* 351 F.Supp. at 1082–83; *In re Flanagan,* 533 F.Supp. 957, 964–65 (E.D.N.Y.), *rev'd on other grounds,* 691 F.2d 116 (2d Cir.1982). Furthermore, "[a]lthough unauthorized disclosure of grand jury testimony is punishable by contempt, such *post hoc* penalties provide little protection for the witness" who is jeopardized by the disclosures. *Flanagan,* 533 F.Supp. at 965; *see also Flanagan,* 691 F.2d at 123; *Cardassi,* 351 F.Supp. at 1082. For these reasons, among others, we have deemed grand jury secrecy a constitutionally inadequate form of protection for those who fear foreign prosecutions. *See Chevrier,* 748 F.2d at 103–04; *Flanagan,* 691 F.2d at 123–24; *accord Tierney v. United States,* 410 U.S. 914, 916, 93 S.Ct. 959, 960, 35 L.Ed.2d 276 (Douglas, *J.,* dissenting from denial of certiorari) (stating that grand jury secrecy is insufficient protection to negate real fear of foreign prosecution because "[t]here are inumerable circumstances in which access to grand jury testimony can be had").

utes that would grant equivalent protection to witnesses whose fear is of foreign prosecutions.

While we need not pass on the constitutional sufficiency of any particular measures today, we note that extradition and deportation are not fixed practices. Congress may regulate extradition.[13] *See* 18 U.S.C. §§ 3181–3196. And the executive branch has substantial discretion over extradition both by statute and through its role in negotiating treaties. *See* U.S. Const. art. II, § 2 (stating that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur"); 18 U.S.C. § 3186 (stating that it is within the Secretary of State's discretion to determine whether an accused person is actually extradited); *United States v. Kin–Hong*, 110 F.3d 103, 109 (1st Cir.), *stay denied*, —— U.S.

——, 117 S.Ct. 1491, 137 L.Ed.2d 816 (1997) (noting that procedures for extradition are governed by statute and that the Secretary may decline to extradite a witness "on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations"). Like extradition, deportation is also regulated by statutes, many of which give considerable discretion to the executive. *See* 8 U.S.C., Ch. 12.

It follows that Congress can pass laws regulating extradition and deportation in cases involving the privilege, just as it has enacted immunity statutes in the past to deal with fear of domestic prosecution.[14] For example, Congress could provide that no one who has been compelled to testify despite a well-founded fear of prosecution in a given country will be deported or extradited to that country (or to countries empowered to so

---

**13.** Extradition treaties are self-executing, and therefore do not require implementing legislation to be binding as law. *See* U.S. Const. art. VI, cl. 2 ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land...."); *Terlinden v. Ames*, 184 U.S. 270, 288, 22 S.Ct. 484, 491, 46 L.Ed. 534 (1902) (stating that extradition treaties are self-executing); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (Marshall, C.J.) ("Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision."). Nevertheless, Congress may change of the law of the land by statute, even when doing so is inconsistent with a treaty previously in existence. *See Clark v. Allen*, 331 U.S. 503, 508–09, 67 S.Ct. 1431, 1434–35, 91 L.Ed. 1633 (1947); *Grin v. Shine*, 187 U.S. 181, 191, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902) ("[N]otwithstanding [an extradition] treaty, Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient."); *Fong Yue Ting v. United States*, 149 U.S. 698, 720, 13 S.Ct. 1016, 1024, 37 L.Ed. 905 (1893) ("In our jurisprudence, it is well settled that the provisions of an act of Congress, passed in the exercise of its constitutional authority, ... if clear and explicit, must be upheld by the courts, even in contravention of express stipulations in an earlier treaty.").

**14.** It is noteworthy that the first federal immunity statute was not passed until 1857, and that it then applied only to those who testified before Congress or its committees. Act of Jan. 24,

1857, 11 Stat. 155. Many additional federal immunity statutes have been passed since the 1857 Act. And the scope of the testimony covered by these statutes has expanded over the course of more than a century. *See generally,* Comment, *The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope,* 72 Yale L.J. 1568, 1571–78, 1611–12 (1963) (recounting the history of federal immunity statutes). But the costs to the government of the privilege notwithstanding, the Fifth Amendment was in full force long before these statutes became commonplace.

In deciding on the applicability of the privilege to those who fear foreign prosecution, we are thus in a position analogous to that of courts that, before immunity was available, interpreted the privilege with respect to domestic prosecution. These courts were not deterred by the costs to government law enforcement of permitting the privilege. *See, e.g., United States v. Burr (In re Willie),* 25 F. Cas. 38, 39–40 (C.C.D.Va. 1807) (No. 14692E) (Chief Justice Marshall— acting as Circuit Justice in the trial of Aaron Burr—construing the scope of the Fifth Amendment privilege for the first time and rejecting the government's argument that the privilege should apply only when the answer to the question would be sufficient to convict the witness of a crime). Indeed, they even overturned early immunity statutes, despite the effect that doing so would have on domestic law enforcement. *See Counselman v. Hitchcock,* 142 U.S. 547, 564, 586, 12 S.Ct. 195, 198, 206, 35 L.Ed. 1110 (1892) (considering the constitutionality of a federal immunity statute for the first time and declaring it unconstitutional because it did "not afford absolute immunity against future prosecution for the offence to which the question relates").

extradite him).  *See Flanagan,* 691 F.2d at 124 (suggesting that a law prohibiting the extradition of a witness who gives testimony pursuant to a grant of immunity would negate the real and substantial risk of prosecution).[15]  Both Congress and the executive branch may thus be able to limit dramatically the domestic law enforcement costs of the interpretation of Fifth Amendment that we accept today by developing schemes that parallel domestic immunity statutes.[16]

We conclude that the negative effect on domestic enforcement efforts of allowing the privilege is of the same order when the witness fears foreign prosecution as when he fears domestic prosecution, and is, in any event, not substantial enough to undermine the fact that granting the privilege to those who fear foreign prosecution is consistent with the language of the Fifth Amendment, with its aims, and with the reasoning of the most relevant Supreme Court cases.  Like the panel in *Gecas,* we therefore believe that this application of the privilege "reasonably serves the purposes of the privilege and preserves the goals of domestic law enforcement."  *Gecas,* 50 F.3d at 1565.

## II.  Waiver

Balsys also alleges that the district court erred by holding that even if he were entitled to the protection of the Fifth Amendment, he waived his privilege when he first applied for immigration.

■■■■  A witness may relinquish his Fifth Amendment privilege against self-incrimination.  *See, e.g., Garner v. United States,* 424 U.S. 648, 654 n. 9, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370 (1976).  A waiver need not be knowing and voluntary.  *See id.*  For instance, when a witness makes voluntary statements on a subject, he implicitly waives any subsequent claim of the privilege with respect to that subject.  *See Rogers v. United States,* 340 U.S. 367, 373, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951).  However, "a waiver of the privilege in one proceeding does not affect the rights of a witness or the accused in another independent proceeding."  *United States v. Miranti,* 253 F.2d 135, 139 (2d Cir.1958);  *see also United States v. Housand,* 550 F.2d 818, 821 n. 3 (2d Cir.1977) (same);  *United States v. Licavoli,* 604 F.2d 613, 623 (9th Cir.1979) (same);  *United States v. Cain,* 544 F.2d 1113, 1117 (1st Cir.1976) (same);  *United States v. Lawrenson,* 315 F.2d 612, 613 (4th Cir.1963) (same).  *But see Ellis v. United States,* 416 F.2d 791, 800 (D.C.Cir.1969) (declining to adopt, under the circumstances of that case, the prevailing rule that waiver of privilege in one proceed-

---

15.  Unless supplemented by some form of judicial enforcement, however, it is unlikely that such constructive immunity would be sufficient to accord witnesses the scope of protection guaranteed by the Constitution.  *See Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665.  And care is required if courts are to be able to enforce any such grant of constructive immunity in the context of extradition.  For example, although the executive branch may make an extradition conditional, the courts cannot.  *See, e.g., Kin–Hong,* 110 F.3d at 110;  *Emami v. United States Distr. Ct.,* 834 F.2d 1444, 1453–54 (9th Cir.1987).  In this respect too, we find ourselves today in a very similar situation to that of the courts that considered the applicability of the privilege in cases involving domestic prosecutions before immunity statutes had been held to be constitutionally valid.  *See supra* note 13.

16.  Of course, such changes in deportation and extradition practices would, to some extent, limit the freedom of the United States to deport or extradite as it chooses.  In this respect, however, they simply parallel the effect, in domestic cases, of immunity statutes that greatly limit the gov-

ernment's capacity to prosecute the witness.  And it is difficult to argue that foregoing a criminal prosecution is not as great a self-imposed limitation as foregoing the right to deport or to extradite a witness to the specific land the government would prefer.  In any event, in both instances the limitation is self-imposed by the government in exchange for getting the testimony it seeks.

For related reasons, we find the suggestion by some courts that this application of the privilege undermines the sovereignty of the United States entirely unconvincing.  *See, e.g., Araneta,* 794 F.2d at 926;  *Balsys,* 918 F.Supp. at 599;  *Lileikis,* 899 F.Supp. at 809.  Since deportation and extradition are controlled by statute and executive discretion in the same way that domestic criminal law prosecution is, the privilege may be invoked by those who fear foreign prosecution only under the same circumstances as it may be used by those who fear domestic criminal proceedings, that is, when the government has passed laws and exercised discretion (or failed to do so) in such a manner as to make some criminal proceeding a real threat.

ing does not affect rights in another proceeding).

■ On his visa application in 1961, Balsys voluntarily answered questions, under oath, concerning his activities during World War II. The district court found that, by answering such questions, Balsys waived his right to refuse to answer the questions OSI seeks to ask him now. It held that the visa application in 1961 and the OSI deportation hearing today are part of the same immigration proceeding.

The law of this circuit, however, does not support this result. Two proceedings must be considered separate where "during the period between the successive proceedings conditions might have changed creating new grounds for apprehension (e.g., the passage of new criminal laws) or that the witness might be subject to different interrogation for different purposes at the subsequent proceeding." *Miranti*, 253 F.2d at 140. Thus, when time passes and circumstances change between a waiver and a subsequent appearance, the initial waiver may not be applied to the subsequent event. *See, e.g., id.* (holding that "two appearances before the same grand jury separated by indictment and conviction for crimes related to the original disclosures and the passage of nearly a year" are not a single proceeding).

Decades have passed since Balsys's application for a visa, and there have been substantial intervening changes in immigration law, in immigration procedures, and in the criminal law of Lithuania, Israel, and the United States. For example, Lithuania, which became an independent state in 1990, passed the retroactive statute under which Balsys fears prosecution in 1992. *See* Law Concerning Responsibility for Genocide of the People of Lithuania, No. 1–2477 (1992) (Lithuania), *as translated in* Joint Appendix at 207. We therefore conclude that Balsys's deportation hearing and his visa application are separate proceedings, and that any waiver Balsys may have made with respect to the visa application is not applicable to the questions asked by OSI.

Even if the visa application and deportation hearing constituted the same proceeding for Fifth Amendment purposes, we are doubtful that Balsys could have waived his privilege against self-incrimination in 1961 with respect to his activities during World War II. When Balsys completed his visa application, he had no Fifth Amendment rights:

> The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment.

*Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 478 n. 5, 97 L.Ed. 576 (1953) (internal quotation marks and citation omitted). It is problematic, to say the least, to suggest that Balsys could have implicitly waived constitutional rights that he did not yet possess.

## CONCLUSION

Because we do not find a significant difference in the harm to governmental interests from granting the privilege to those who fear foreign prosecutions, and to those who fear domestic prosecution, because the reasons for allowing the privilege are similar in both situations, and because the language of the amendment does not distinguish between the two, we hold that the Fifth Amendment privilege against self-incrimination may be invoked by a witness who possesses a real and substantial fear of foreign prosecution. Since Balsys is such a witness, and since we find that the district court erred in concluding that Balsys waived his right to invoke the privilege with respect to the current immigration investigation, we vacate the district court's order compelling compliance with the government's administrative subpoena and remand for proceedings consistent with this opinion.

BLOCK, District Judge, with whom Judge CALABRESI joins, concurring:

I concur fully in Judge Calabresi's opinion, which I join. I also write separately, howev-

er, to express my concern, triggered by Judge Meskill's concurrence in the result, that our decision today may be perceived as qualifying the privilege in cases involving a real and substantial fear of foreign prosecution based upon a case-by-case analysis of domestic law enforcement interests. According to Judge Meskill, the determinant in such an *ad hoc* scenario should be the balance to be struck between the enforcement of our organic laws and the protection that the Fifth Amendment privilege affords to the affected individual.

This relativist approach echoes the holding of *United States v. Lileikis*, 899 F.Supp. 802 (D.Mass.1995), relied upon by the district court in this case. In *Lileikis*, the court attempted to stake out an intermediate position between the approach taken by the Court of Appeals for the Fourth Circuit in *United States v. (Under Seal) (Araneta)*, 794 F.2d 920 (4th Cir.1986), which did not permit invocation of the privilege, and that of the Eleventh Circuit in *United States v. Gecas*, 50 F.3d 1549 (11th Cir.1995), in which the privilege was permitted to be invoked. The *Lileikis* court, attempting "to borrow constructively" from both opinions, 899 F.Supp. at 808, held that where a witness invokes the privilege based upon a real and substantial fear of foreign prosecution, the privilege should nonetheless give way "[i]f a governmental interest in enforcing the organic laws of the United States is involved, and the United States has a legitimate need for a witness's testimony in furthering that interest...." *Id.* at 809. At the same time, however, the court also determined that it was inappropriate to "bend the Constitution solely to promote the foreign policy objectives of the executive branch, however laudable, by compelling the cooperation of a witness in a proceeding that does not have as its fundamental purpose the vindication of the domestic laws of the United States." *Id.*

In my opinion, the privilege against self-incrimination is too principled a proposition to be dependent upon the quantification of governmental interests and the unpredictability of *ad hoc* adjudication. There is nothing in the lexicon of Fifth Amendment jurisprudence that supports the thesis that,

barring waiver, factors other than a legitimate fear of prosecution should enter into its calculus. While the debate on this issue, which has been taunting the courts ever since *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) and *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) were decided in 1964, will continue until resolved by the Supreme Court, it seems to me that one must bite the conceptual bullet—either the privilege can be invoked by one facing a real and substantial fear of foreign prosecution, or it cannot—rather than grapple with balancing and qualifying the privilege's application.

In opting for its unqualified application, I am satisfied that the concerns of Judge Meskill and others over compromising the efficacy of domestic law enforcement will invariably be subsumed by the factors that enter into the threshold determination of the legitimacy of the fear, and some very practical realities.

In determining whether the requisite real and substantial fear of foreign prosecution exists, this court has identified five factors for consideration:

> whether there is an existing or potential foreign prosecution [against the witness]; what foreign charges could be filed against [the witness]; whether prosecution of them would be initiated or furthered by [the witness's] testimony; whether any such charges would entitle the foreign jurisdiction to have [the witness] extradited from the United States; and whether there is a likelihood that [the witness's] testimony given here would be disclosed to the foreign government.

*United States v. Flanagan*, 691 F.2d 116, 121 (2d Cir.1982); *see also United States v. Chevrier*, 748 F.2d 100 (2d Cir.1984); *United States v. Gilboe*, 699 F.2d 71 (2d Cir.1983). The fear "must be a real and reasonable one, based on objective facts as distinguished from [the witness's] subjective speculation." *Flanagan*, 691 F.2d at 121; *Gecas*, 50 F.3d at 1553-66 (application by Eleventh Circuit of test similar to *Flanagan*). This rigorous test, requiring consideration, *inter alia*, of the likelihood that a witness's testimony

would be disclosed to the foreign government and whether the foreign prosecution would be initiated or furthered by the testimony, *see Flanagan,* 691 F.2d at 121, will undoubtedly uncover those situations, such as *Gecas* and the present case, where the government is actively involved in facilitating a foreign prosecution and the risk of governmental overreaching is, therefore, sufficiently acute to warrant invocation of the privilege. But the test is also sufficiently rigorous to "eliminate[ ] the apprehension that a person could manufacture a potential for foreign prosecution or raise this specter solely to frustrate domestic law enforcement." *Gecas,* 50 F.3d at 1564. I agree, therefore, with the panel's rationale and conclusion in *Gecas:*

> Just as the privilege is extended to prevent overzealous prosecution and to constrain the government, the privilege creates in the individual the freedom to remain silent where the testimony may be adverse to his penal interests. One purpose need not eclipse the other in its function. If the court reasonably finds that the fear of foreign prosecution is an actuality rather than a mere speculation, the individual should prevail and be permitted to invoke the privilege. If the prospect of foreign prosecution is pure conjecture, then the importance of domestic law enforcement prevails, and the witness must testify.... [S]uch a balance both reasonably serves the purposes of the privilege and preserves the goals of domestic law enforcement.

*Id.* at 1564–65.

In any event, in a very real sense, I am not at all certain that the goals of domestic law enforcement would be significantly enhanced if the privilege could not be asserted. It simply cannot pragmatically be assumed that when faced with the "cruel trilemma of self-accusation, perjury or contempt," the choice would invariably be self-accusation. Balsys, for example, would obviously choose domestic contempt over foreign execution and it is unlikely, therefore, that the government would ever elicit from him the answers to its questions. The only practical domestic goal at stake would be the enforcement of our contempt laws, which are quite charitable. Had we held today that Balsys could not

invoke the privilege, he initially would only be subject to civil contempt for his expected and rational silence. 28 U.S.C. § 1826(a) (1994); *Simkin v. United States,* 715 F.2d 34 (2d Cir.1983). However, a court's authority to impose civil contempt sanctions "is limited by the concept that such sanctions are by their nature coercive rather than punitive." *United States v. Giraldo,* 822 F.2d 205, 210 (2d Cir.1987); *see also United States v. Doe (In re Grand Jury Proceedings),* 862 F.2d 430, 432 (2d Cir.1988). By statute, the duration of a witness's civil confinement for a refusal to testify in court is not permitted to exceed the duration of the court proceeding, or 18 months, whichever is shorter. 28 U.S.C. § 1826(a). Further, as a matter of common law, if it becomes clear during the witness's period of imprisonment that "there is no reasonable possibility that the sanction imposed for civil contempt will have the desired coercive effect, the sanction should be ended." *Giraldo,* 822 F.2d at 210; *see also Simkin,* 715 F.2d at 36–37; *Soobzokov v. CBS, Inc.,* 642 F.2d 28, 31 (2d Cir.1981). Similarly, although the court is empowered to assess a fine, the fine cannot continue after the court has determined that the fine is not having a coercive effect. *See Soobzokov,* 642 F.2d at 31. As for criminal contempt pursuant to 18 U.S.C. § 401, while it is available once it is determined that the civil contempt remedy is unavailing, *see Simkin,* 715 F.2d at 37, it is unlikely to result in a prolonged period of incarceration. *See id.* at 38 ("fear may warrant lenient sentence of criminal contempt") (citing *Harris v. United States,* 382 U.S. 162, 166–67, 86 S.Ct. 352, 354–55, 15 L.Ed.2d 240 (1965)).

In sum, for a witness facing a real and substantial fear of foreign prosecution, and foreign punishment, the choice of contempt may be preferable to the fate that awaits him abroad. Consequently, it is by no means assured that a different holding today would have a markedly different impact upon domestic law enforcement. To the extent that it does, the relinquishment of the enforcement of our contempt laws, such as they are, strikes me as a civilized trade-off for upholding a fundamental principle of individual dignity.

Judge CALABRESI authorizes me to say that he concurs in this opinion.

MESKILL, Circuit Judge (concurring in the result):

I concur in the result.

OSI's mission is the investigation and institution of denaturalization and deportation proceedings of suspected Nazi war criminals. The issuance of the administrative subpoena here was in furtherance of that mission. The district court correctly concluded that the answers to the questions posed, if incriminating, would be shared with the government interested in prosecuting Balsys, and Balsys likely would be deported to Lithuania.

Thus, in this case the government's main interest in enforcing its organic laws is in facilitating a foreign prosecution. Therefore, in balancing the government's interest in domestic law enforcement with Balsys' interest in the protection the Fifth Amendment privilege affords, Balsys' interest is the weighty one. The Fifth Amendment protects Balsys' individual dignity and privacy, protects him against our government's pursuit of its goals by excessive means, and promotes the values of our justice system.

However, our decision today should not be interpreted as *carte blanche* for honoring a Fifth Amendment privilege against self-incrimination in all domestic proceedings where the recipient of the subpoena has a well-founded fear of foreign prosecution. Other scenarios may call for a different result. Therefore, rather than determining today that "cooperative internationalism" rises to the level of "cooperative federalism," and therefore causes concern for government overreaching in cases when a witness fears foreign prosecution and that there is a correlation between real fear of foreign prosecution and government overreaching, as the majority opinion does, our decision should be limited to the facts before us and to OSI proceedings.

I also dissociate myself from that part of the majority opinion entitled "The Conflict Rarely Arises," because it is speculative and unnecessary to a resolution of this appeal. I also cannot support the discussion entitled "Parallels to Immunity Statutes May Be Enacted." The role of the judiciary is to decide cases, not to suggest to the Executive and Legislative branches of government ways to solve problems that our decision today may cause in the future. I believe it is better to limit our decision to the facts of this case and I concur in the result reached with the understanding that courts will interpret our decision in this limited way.